Lawrence R. JANKINS

v.

TDC MANAGEMENT CORPORATION, INC., District Contracting Corporation, Transnational Venture Capital Development Corporation and T. Conrad Monts, Appellants.

Nos. 92–7068, 92–7097.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1993.

Decided April 12, 1994.

William T. Coleman, Jr., Washington, DC, argued the cause for appellants. With him

on the briefs were Debra A. Valentine, Thomas J. Karr and Dennis F. Nee, Washington, DC.

Dwight D. Murray, Washington, DC, argued the cause for appellee. With him on the brief were Jayson L. Spiegel and Michael E. Reheuser, Washington, DC.

Before: EDWARDS, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

T. Conrad Monts, a District of Columbia real estate developer, asked Lawrence R. Jankins to work for him preparing budgets and negotiating construction contracts, particularly on two large renovations of subsidized housing in the District, projects known as "Southern Gardens" and "Jeffrey Gardens". According to Jankins's testimony, Monts asked him to consider a "minimum number" per month that it would take for Jankins to survive and pay his current obligations. Jankins calculated that he would need $6,800 per month net income, which amounted to "approximately $100,000 a year" (or $8,333.33 per month). Monts also offered "additional compensation" of "18 percent of the profits earned" on "any property that [Jankins] worked on". Joint Appendix ("J.A.") 160–61. His salary was to be paid biweekly, and the 18% profit would be "earned" "when [Jankins] completed [his] task of putting together the job, bringing in the contractors, completing the budgets and the engineering". J.A. 190. As profits could not be calculated at all accurately at that stage, we understand "earned" to refer to the vesting of Jankins's 18% share.

Although Monts employed Jankins for 13 months, from August 1986 to September 1987, Jankins received no payment for his services until approximately nine months after starting. The first payment—$20,000—came on April 28, 1987, just as the first funding became available for Jeffrey Gardens. The second and only other payment—also for $20,000—came on September 1, 1987,

the day after construction financing for the first phase of Jeffrey Gardens came through.

On September 15, 1987, the day that Monts "clos[ed]" on the "purchase" of Southern Gardens, Trial Transcript ("Tr.") at VI–9–10, Jankins demanded payment of his "back salary"—then presumably about $68,000 ($8333.33 x 13 [about $108,333], minus $40,000 already paid).[1] J.A. 199. According to Jankins, Monts agreed to pay, but said that "it would be monies paid from December and not from August, when I actually started my employment." J.A. 207. Conceivably this may have been Monts's way of asserting credit for the $40,000 already paid, but Jankins regarded it as an attempted renegotiation of his contract, id., and decided he could not remain in Monts's employ. Jankins did not find satisfactory alternative employment until about 10 months later, in June 1988. Construction on Jeffrey Gardens began soon after his departure and was completed by April or May of 1990. Southern Gardens had not been completed even at the time of trial.

Jankins brought suit in district court, asserting not only breach of contract through Monts's failure to pay, but also fraud. He also sued Monts's wife, who was granted a directed verdict and is no longer a party, as well as a number of corporations owned or controlled by the Montses—TDC Management Corporation, Transnational Venture Capital Development Corporation, and District Contracting Corporation. The jury found for Jankins, awarding compensatory damages of $456,990 (presumably unpaid wages plus the 18% share of profits), plus punitive damages of $50,000. In addition, the district court ordered the defendants to pay $70,699.50 in attorneys' fees as part of its sanctions for recalcitrance in discovery.

We affirm in part and reverse in part. First, although plaintiff's fraud theories evolved rather confusedly, we reject defendants' contention that the district judge erred in letting the fraud claim go to the jury. Second, we find that the court erred in two evidentiary rulings relating to the fraud claim—(1) admitting evidence of Monts's later conduct toward subcontractors as evidence of fraudulent intent and (2) refusing to permit defendants to impeach a key plaintiff's witness with a prior inconsistent statement. Accordingly, we must reverse and remand for a new trial on the fraud count, on which plaintiff's entitlement to punitive damages depends. Third, there are errors in the calculation of compensatory damages. Because the contract was at will, lost wages may include only the period during which Jankins was actually employed. Further, because Jankins offered no adequate evidence as to "profits", no recovery is permissible under that heading. Fourth and finally, we affirm the imposition of discovery sanctions.

### 1. *Refusal to grant judgment for defendants on the fraud claim*

Jankins's fraud claim rests on two alternative theories. The first is that Monts fraudulently induced Jankins to *enter* into the contract, intending at the outset not to pay Jankins all that he promised him; the second is that after Jankins started work Monts induced him to *continue* doing so, despite lack of full payment, babying him along with false representations that he would pay as soon as he had money to do so.

The first theory does not fare well when measured against Jankins's amended complaint. It alleged that Monts "falsely and fraudulently represented to Mr. Jankins that he would be paid the agreed upon salary on a biweekly basis *out of funds which defendants would receive from the District of Columbia government ... for work on the Jeffrey Gardens project and other projects*", J.A. 13 (emphasis added), and that he "continued to falsely ·and fraudulently represent to Mr. Jankins that defendants would receive funds for work on Jeffrey Gardens and other projects and that Mr. Jankins *would be paid the agreed upon salary out of such funds*". Id.

---

1. One of the many ·issues on which the briefing· and evidence is obscure is whether for tax purposes Monts treated Jankins as an employee (and thus withheld income taxes on the sums paid), or as an independent contractor (and thus did not withhold taxes). In treating the $8333.33 per month as due Jankins we are assuming throughout that Monts withheld no income taxes. If that assumption is in error, Monts is free to have the record and damage computation corrected on remand.

at 14 (emphasis added). Although a trial court ruling (issued as a discovery sanction) established that the "defendants had sufficient funds to pay whatever was owed to Mr. Jankins" during his period of employment,[2] J.A. 149, it is not clear to what extent Monts *received* funds of the type Jankins alleged were earmarked for his salary, much less whether they exceeded Monts's payments to Jankins. Each of the two $20,000 payments came precisely when funds relating to Jeffrey Gardens became available. Of course it may be that with more information about what "projects" were covered by the alleged contract, and about the sums paid with respect to each project and possible claims on them, Jankins might have made out a breach even on the earmarked funds theory, and conceivably even fraud. But if the record contains such evidence, plaintiff has pointed us to none of it.

■ At trial, Jankins's proof took a rather different turn. He testified in essence that Monts promised to pay him when cash was available from *any* source, and that Monts tried to justify non-payment entirely by saying he didn't have the money. For example, Jankins testified that Monts told him that "there were some properties that were going to be liquidated in other parts of the country [ . . . and] that my pay would start on a regular basis soon." J.A. 194; see also *id.* at 195, 199. Given the trial court's ruling that Monts "had the money to pay whatever the salary terms were", *id.* at 147; see also *id.* at 149, this would establish intentional deceit. Jankins also testified that he kept on working because he believed Monts's misrepresentations, J.A. 208, so the jury could have found the reliance necessary to establish fraud. See *Higgs v. Higgs,* 472 A.2d 875, 876 (D.C.1984) (setting forth elements of fraud); *BWX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 712–13 (D.C.Cir.1991) (noting that award of punitive damages requires proof not merely of fraud but of aggravating circumstances). The district court denied

the motion for judgment in favor of defendants in reliance on this theory, J.A. 419, and defendants on brief never seriously confront the claim. We find no error in this ruling.

### 2. *Evidentiary errors*

■ *Similar acts evidence.* To support his fraud claim, plaintiff offered the testimony of four subcontractors who worked on the Jeffrey Gardens project, three of whom later had disputes with Monts over his alleged failure to pay and their alleged failure to perform. The defendants argue that the testimony was inadmissible, first as failing to satisfy the requirements of Fed.R.Evid. 404(b) and second as having prejudicial effects outweighing its probative quality under Rule 403. We agree that this testimony fails to satisfy Fed.R.Evid. 404(b), and therefore do not reach the balancing required by Rule 403.

At the outset we can put aside the testimony of one subcontractor, Richard Wewerka, who had no dispute whatsoever with Monts. He negotiated a contract solely through Jankins to design and implement landscaping for Jeffrey Gardens. At the time of Jankins's resignation, Wewerka had completed only the design portion of the contract. J.A. 291. Soon thereafter, he "bowed out" of the construction portion of the contract because his "real working relationship was with Mr. Jankins", and he didn't "trust contracts as much as . . . relationships." *Id.* He was fully paid by Monts for the work completed. As Jankins's counsel conceded at oral argument, Wewerka's testimony served no purpose other than to demonstrate that Jankins was trustworthy and by inference that Monts was not.

The other three subs—John Magnolia, Michael Toman, and Dan Mirro—all testified to disputes with Monts at the conclusion of their work on Jeffrey Gardens. Curiously, two out of the three subs negotiated their contracts with Jankins rather than Monts.

---

2. The sanction ordered by the magistrate merely denied defendants the right to present evidence that they did not have sufficient funds to pay Jankins. J.A. 22–23. The trial court, however, affirmatively established that fact as an accommodation to the *defendants,* who sought to limit

the plaintiff's introduction of evidence concerning the defendants' wealth. See Tr. I–9–24, 30; J.A. 146, 147; see also Defendants' Motion to Reconsider Bifurcation of Liability and Damages, January 14, 1992, Docket Entry No. 275.

See J.A. 263, 267 (Magnolia); 278 (Toman). In each case the dispute arose years after Monts and Jankins entered their contract in the summer of 1986, and months or years after the Monts–Jankins blow-up in September 1987. The earliest dispute was Magnolia's, beginning in early 1988, J.A. 267–70, 301; Mirro's dispute started in September or November of 1988, J.A. 294; and Toman's did not start until the final stage of construction, J.A. 288, which places it roughly in the Spring of 1990. In each case the sub contended that he had fully performed, yet Monts withheld some of the amount due on completion—from Mirro 10% "retention money", J.A. 293–97; from Toman $53,000 out of a $700,000 contract, J.A. 280, 282; and from Magnolia about $90,000 on a $217,000 contract, J.A. 268. At the time of the Jankins trial, Magnolia had settled with Monts, Tr. at III–109, and Toman's and Mirro's claims were pending in arbitration (Toman, J.A. 280, 282) or litigation (Mirro, J.A. 299). None of the subs claimed that their disputes with Monts were particularly unusual in the context of the construction industry. Indeed, Magnolia explicitly acknowledged that a general contractor has the right to withhold payment until he or she is satisfied that all work has been completed, J.A. 271, and when asked if this was a fairly common occurrence, replied, "It happens." *Id.* 272. Indeed, Jankins himself—when asked if he "ever owed a sub money and paid them less than 100 percent of what they were owed and negotiated a discount with them?"—admitted "It's probably happened, yes, sir. . . . It happens today in the business I'm currently involved in." When asked if it happens "a lot?", he replied "Yes, sir, it does." J.A. 234–35. There was no evidence that Monts was entangled in an unusually high incidence of end-of-contract disputes, or that his degree of fault exceeded the fault of general contractors as a whole.[3] Indeed, the testimony did not explore the scope of Monts's fault at all.

Rule 404(b) states that evidence of "other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith", but that such other acts may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident". The line is doubtless inexact, and we review only for abuse of discretion. *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C.Cir.1989). Here, however, the subs' testimony appears so different from the alleged fraud and so remote in time that it was not properly offered to show "plan" or "intent", the only arguable grounds of admissibility.

The subcontractors' testimony reveals no common plan or scheme by which Monts was systematically committing fraud. There is no "*such concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*" See *United States v. Dothard*, 666 F.2d 498, 502 (11th Cir.1982) (quoting *United States v. Goodwin*, 492 F.2d 1141, 1153 (5th Cir.1974)) (quoting 1 Wigmore, Evidence § 304 at 202–03 (3d ed. 1940)) (emphasis in Wigmore.) Indeed, these extrinsic acts are similar to Monts's alleged treatment of Jankins only in that they involve allegations of contract breaches and of some form of strategic behavior. Taken for all they might possibly be worth, they show an attempted exploitation of the subs' bind—their commitment of nonrecoverable resources prior to full payment, coupled with the legal expense and delay each would face if forced to sue Monts for the balance due. This behavior can be likened to Monts's alleged imposition of similar burdens of expense and delay on Jankins, and, very loosely, to his alleged exploitation of Jankins's hopes of a vested share of profits.

But this "similarity" involves reformulation of the Monts–Jankins dispute at a rather high level of generality. Jankins wasn't making a claim of strategic behavior; he alleged fraud. Yet the subs offered no evidence of fraudulent representations by Monts; indeed, three of the four subs had

---

3. One of the subcontractors—Mirro—did state that he knew of "quite a few" other subcontractors for Jeffrey Gardens who had not been paid. J.A. 295. He identified them by occupation— "electrical", "mechanical", etc., *id.*—but provided neither details nor any basis for comparison with the construction industry generally.

done their contracting primarily through Jankins. Perhaps implicitly recognizing the remoteness of the subs' evidence, Jankins's attorney remarked in his opening statement at trial that "this case, in essence, is about greed." J.A. 150. Any formulation that equates Monts's treatment of the subs with his treatment of Jankins—greed, a tendency to strategic behavior, etc.—can be only a shade less general than a claim that Monts was a bad man. Because the evidence essentially addresses character, its use is forbidden by Fed.R.Evid. 404(b). See, e.g., *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir.1978).

The same lack of similarity also precludes use of the evidence to show Monts's "intent", the other arguably applicable purpose for which Rule 404(b) allows admission of similar-act evidence. The intent required for fraud is an intent to *deceive* (here primarily in the form of misrepresentations about inability to pay salary due during the course of performance). Even if we were to infer that Monts's assertions of defects in the subs' work were completely phony (and the subs did not establish any such thing), the fact of his making such assertions would show gall more than deceit. Jankins, by contrast, *never* suggested in his testimony that Monts tried to get out of paying by attacking the quality of his services, although Monts at trial testified that that was in fact the reason he withheld payment. Tr. at Va–91.

The disputes with the subs are also remote in time. Monts's alleged misrepresentations about cash extended over a period of time that clearly came to an end in September 1987, when Jankins gave up. But the strong-arming of the subs did not even start until a good deal later—four months (Magnolia), one year (Mirro), or two-and-a-half years (Toman). (See *supra* for dates). Moreover, the allegedly similar acts *followed* the one in dispute, a sequence that further weakens the link. Projection of an evil purpose backward in time seems weaker than inferring its continuation. "The temporal (as well as the logical) relationship between a defendant's later act and his earlier state of mind attenuates the relevance of such proof...." *United States v. Watson*, 894 F.2d 1345, 1349

(D.C.Cir.1990). See also *United States v. Jimenez*, 613 F.2d 1373, 1376 (5th Cir.1980) (where cocaine possession followed the charged heroin transaction by a year, the lapse "depleted the extrinsic offense of any relevance which could have outweighed the peril of jury prejudice").

Our recent decision in *United States v. Brown*, 16 F.3d 423 (D.C.Cir.1994), is not to the contrary. There we upheld the admissibility of a gun and a telephone pager seized three months after the charged possession of drugs and guns. We said that the later possession of a gun (with its serial number effaced) tended to show "intent, knowledge or absence of mistake" as to the earlier firearms possession—precisely the same crime. Slip Op. at 431. As to the pager, we said that evidence of its possession months after the crime "may have had some probative value" as a tool of the trade, but was not prejudicial because pagers are worn by many persons other than drug dealers, such as doctors and legal assistants. *Id.* at 431. Further, however one may evaluate evidence of possession of a pager, it is hard to say that it is evidence of *character*—the type of evidence that Rule 404(b) explicitly forbids.

As we said at the outset, one cannot draw the line precisely between evidence of character and evidence of acts sufficiently similar to show intent or a common scheme. But when one must, in order to find similarity, define the character of the acts at such a high level of generality as here (greed, strategic behavior), and many of the events occur years after the conduct in dispute, we cannot find the conditions of admissibility under Rule 404(b) satisfied.

*Impeachment of Jankins's Accountant.* Dennis Gowin was Jankins's accountant and the only non-party witness to testify concerning the negotiation and contracting between Jankins and Monts. His testimony confirmed Jankins's testimony that he was entitled to "18 percent of appreciation on any project that [he] was involved in", J.A. 351, which Gowin also described as the "same as profit on your home" (i.e., the difference between buying and selling price net of any costs), J.A. 384. See also *id.* at 381 (Jankins's counsel asserts that the interest is in

"profits" and denies that Jankins's claim was for an 18% ownership interest); but compare *id.* at 357 (suggesting that value of interest may be computed as 18% of value of Monts's interests). He also established . that Jankins's interest vested at the start of construction work on a project, *id.* at 352, and confirmed Jankins's testimony that he demanded his salary from Monts "on a weekly basis", *id.*

Monts attempted to impeach Gowin with a prior inconsistent statement allegedly made by Gowin to a lawyer conducting investigations for the defense, one Michael Stone. According to Stone's notes, Gowin told him that "the equity sharing concept, ambiguous at the time of employment, was discussed after [Jankins's] employment, but never resolved. He [Gowin] does not feel that Jankins is due one dime above the agreed salary amount." *Id.* at 113. When plaintiff's counsel objected, the trial court inquired whether the "statement" that defense counsel was using was "a signed statement", and, being told that it was not, declared, "You can't use that.... You can't do that with some unsigned summary by an investigator. It's not [Gowin's] written statement you're cross-examining with. It's not something he's acknowledged and accepted." *Id.* at 375, 376. The court contrasted Stone's memorandum with a written or oral statement that the witness has "adopted". *Id.* at 375.

■ Fed.R.Evid. 613(a) clearly contemplates that a witness's prior *oral* statement may be the subject of cross-examination, as it explicitly addresses "examining a witness concerning a prior statement made by the witness, *whether written or not*". An oral statement—in itself—obviously cannot be "signed" or "adopted", and it would be illogical (and, indeed, bizarre) to bar the use of a prior oral statement for impeachment *because* there happened to be written evidence of it. There can therefore be no requirement that a prior oral statement, which happens to have been recorded in writing, have been "adopted" by a witness prior to its use for impeachment in the witness's examination. See, e.g., *Gray v. Busch Entertainment Corp.*, 886 F.2d 14 (2nd Cir.1989). (nurse's written report of a witness's statement ad-

missible for impeachment where witness denied having made any statement); *United States v. Nacrelli*, 468 F.Supp. 241, 253 (E.D.Penn.1979) (impeachment of witnesses through reports prepared by FBI agents setting forth their recollection of interviews with witnesses). Thus, counsel should have been free to cross-examine Gowin on the basis of his statements to Stone.

■ Somewhat obscurely in his brief (Appellee's Brief at 24 n. 15), and more explicitly at oral argument, Jankins argued that the ruling was proper because counsel was reading from the investigator's notes. A comparison of the notes with the transcript tends to confirm that in fact this was the case. Because of the jury's possibly being deceived into believing that Gowin had written the words in question, there was obviously no obstacle to the court's issuing suitable instructions to counsel, or simply instructing the jury that the paper in counsel's hand was not signed or approved by Gowin. See Fed. R.Evid. 611(a)(1). Instead, however, the court used the language quoted above, simply cutting off cross-examination based on the statement in counsel's hand. If the court's reason was counsel's use of verbatim quotes, or that there was something wrong in the *manner* of counsel's use of the statement, it gave little hint of that theory. Rather, the court told counsel that the ban was just a consequence of counsel's "strategic decision not to depose" Gowin. J.A. at 376. We see nothing to suggest the more limited objection now voiced by Jankins.

These evidentiary rulings cannot be regarded as harmless. Three contractors paraded their unhappy relationships with Monts before the jury; a juror might well have concluded either that Monts was a bully who ought to be made to suffer regardless of where the truth lay as between him and Jankins, or that Monts's bullying character showed a propensity to mistreat people, thus increasing the likelihood that he had in some way mistreated Jankins. Gowin was the sole source of confirmation of Jankins's account of his basic deal with Monts, so the failure to

allow impeachment with a prior inconsistent statement was potentially critical.[4]

### 3. Post-termination "lost wages"; the 18% share of profits

Under District of Columbia law, an employment contract that does not clearly express a specific duration is presumed to be terminable at will by either party. *Sullivan v. Heritage Foundation*, 399 A.2d 856, 860 (D.C.1979). Indeed, the presumption operates even if the parties speak of the employment as "permanent". *Minihan v. American Pharmaceutical Association*, 812 F.2d 726 (D.C.Cir.1987). Here there is no evidence to overcome the presumption. The oral agreement did not express a specific duration and there is no evidence that Monts and Jankins intended the latter's employment to be for a fixed period.

The contract was clearly terminated on September 15, 1987—the day of the dispute concerning backpay. Thus Monts cannot be liable for wages that would have been earned had the lawful termination not occurred. *Lyons v. Capital Transit Co.*, 62 A.2d 312, 313 (D.C.1948); see also *Treadwell v. John Hancock Mutual Life Insurance Co.*, 666 F.Supp. 278, 286 (D.Mass.1987).

Jankins's response is a claim that Monts's behavior on September 15, 1987 constituted an anticipatory breach of the contract. The doctrine, as suggested by the more complete name of "breach by anticipatory repudiation", see E. Allan Farnsworth, *Contracts* 656 n. 2 (2d ed. 1990), enables a plaintiff to recover (and to stop his own performance) when the defendant has flatly repudiated the contract. See, e.g., *id.* at 666; *New York State Teamsters Fund v. Pension Benefit Guaranty Corp.*, 591 F.2d 953, 957 (D.C.Cir. 1979). We fail to see any role for the doctrine when a party that is entitled to terminate at will simply exercises that power.

Thus Monts's only liability for lost wages applies to the 13–month period from August 1986 to September 1987. As the parties themselves agreed that the intended $6,800 after-tax per month translated into $100,000 a year (or $8,333.33 per month), Monts is liable for lost pre-termination wages of $108,-333.33 (i.e., $8,333.33 × 13), minus the $40,-000 that Jankins was paid, or $68,333.33.

To establish the "profits" out of which Jankins claimed his 18%, Jankins offered evidence of the "value" of Jeffrey Gardens, Southern Gardens and one of Monts's corporations, District Development Corporation. But evidence of the value of a product is at most a half step to proving the producer's "profit". A value of millions (or billions) is completely consistent with a profit of zero or an immense loss. Consider, for example, the Edsel.

The documents on which Jankins relies characterize the "values" in question as "net", *id.*, and Jankins argues that this makes them evidence of profit. But in ordinary parlance "net value" refers to gross value minus relevant indebtedness, not gross value minus cost. Thus it does not advance Jankins toward determination of profit.

On occasion Jankins referred to a right to an 18% interest in the properties in question. J.A. 232, 256–57, 258. But in the only morsel of testimony we can find where he was at all specific about this terminology, he explained that he had the option to convert the alleged interest in 18% of the profits into "value of the property, if I chose", J.A. 232, but that he never did so. J.A. 257. At one point Jankins suggested that this meant calculating 18% of profits and then converting it into an ownership interest of the same value, *id.* at 256, but that of course takes us right back to profits. Without more, we cannot find an evidentiary basis for calculation of 18% of profits. *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C.Cir.1990) ("court must ensure that the record adequately supports all items of damages claimed ... lest the award become speculative").

Accordingly, Jankins's compensatory damages can include neither wages for any peri-

---

4. Below we set aside the judgment, for want of proof, insofar as it awarded damages for the alleged 18% of profits. That ruling does not render the bar on impeachment of Gowin harmless, since his testimony was also relevant to the fraud count and any impeachment might have undermined his credibility generally.

od after termination of the contract in mid-September 1987, nor any sum for the 18% share of profits. This limits them to the $68,333.33 for unpaid wages from the start of his employment until its end.

#### 4. Discovery sanctions

■ Plaintiff "sought discovery regarding such matters as the services performed or rendered by plaintiff, monies received by defendants for those services, the organization of the corporate defendants and the role of the individual defendants in the corporations." See *Jankins v. TDC Management Corp., Inc.,* 131 F.R.D. 629 (D.D.C.1989). However, in a remarkable "pattern of delay and obfuscation", *id.* at 634–35, the defendants resisted the discovery of specified financial records, computer disks and other information. The magistrate who held a hearing on motions for discovery sanctions and award of attorneys' fees and expenses found that:

> defendants' counsel has violated not only the letter and spirit of Rules 11 and 26 of the Federal Rules of Civil Procedure and the Local Rules of this Court, but also at least 11 express orders of the trial court and the Magistrate. The misconduct of defendants' counsel has also occasioned two extensions of the discovery cut-off and one continuance of the trial....

*Id.* at 632.[5] The magistrate also found that "[i]n resisting discovery ... [t]he objections interposed by counsel for defendants [were] consistent in their untimeliness, lack of factual basis and absence of supporting authorities." *Id.* The magistrate granted the plaintiff's motion for award of attorneys' fees and expenses and his motion for sanctions. *Id.* at 635.

Despite the magistrate's order, abuse of the discovery process continued. On June 27, 1989, the trial court found that, given "the lack of complete financial records, including tax returns, from the defendants", the case was "not ready for trial", and continued it yet again, this time until the magistrate "had an opportunity to rule on all outstanding discovery matters." In a memorandum order filed December 22, 1989, the magistrate found

that defendants still had not fully complied with orders requiring discovery.

Ultimately the magistrate ordered and the trial court enforced discovery sanctions that included barring the defendants from introducing evidence at trial in opposition to particular claims regarding which discovery had been particularly resisted, plus $70,699.56 for attorneys' fees and expenses incurred by the plaintiff in securing discovery compliance. This meant that defendants were barred from presenting evidence to refute Jankins's proof (whatever it might be) (1) that he was employed by defendants during the period relevant to his complaint; (2) that the defendants had funds with which to pay him; and (3) that he suffered damages in such amounts as he might prove. J.A. 23–24. They were also precluded from introducing evidence in support of their counterclaims. J.A. 24.

There is no claim that such orders are beyond the scope of the rules, and there could not be. Fed.R.Civ.P. 37(b)(2) authorizes the combination employed here—a ban on presentation of evidence on specified issues, coupled with an award of expenses (including attorneys' fees).

Defendants argue that the "fundamental reason for imposing such severe sanctions" was "an imminent trial date". Because trial was thereafter postponed until about two years later, they claim that the sanctions should have been lifted. Defendants misconceive the magistrate's reasoning. In her memorandum opinion of February 17, 1989, she wrote:

> With the trial just weeks away, plaintiff still has not received from defendants the evidence crucial to his claims. The Magistrate *thus* concludes that only the sanctions imposed can "ensure that the spirit and object of discovery under the rules are maintained."

131 F.R.D. at 635 (citation omitted and emphasis added.) At first glance one might take the use of the term "thus" to imply that the imminence of the trial was a predicate for the sanctions. The paragraph from which defendants have plucked the sentence, the

---

**5.** The counsel referred to are different from counsel on appeal.

last paragraph of the opinion's text, makes clear that quite different reasoning supported the sanctions:

> While the Magistrate recognizes that the sanctions imposed are *harsh,* she is satisfied that they are *warranted.* Defendants' counsel has resisted the Magistrate's efforts to cajole and gently persuade him to conduct discovery in good faith; when the initial casualness yielded to formality, defendants' counsel continued his pattern of delay and obfuscation.

*Id.* at 634–35. (emphasis added.) The sanctions were "harsh" simply because harshness was "warranted".

The standard of review for a trial court's decision to impose such sanctions is abuse of discretion. *United States v. Wallace,* 964 F.2d 1214, 1217 (D.C.Cir.1992). Given the defendants' willful misconduct, and the purpose of sanctions as a penalty and to deter misconduct by others, see *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976), we can find no abuse. We also find that the amount of the attorneys' fees was supported by the record.

\* \* \*

Because of the evidentiary errors, the judgment on the fraud count (and thus the fraud-dependent $50,000 in punitive damages) is reversed and remanded for a new trial. Of the $456,990 compensatory damages awarded, only $68,333.33 (wages due for the period worked, less amounts paid) is properly recoverable; the judgment is affirmed as to such damages and as to the $70,699.56 in discovery sanctions.

*So ordered.*