Cathy S. NEUREN, Appellant,

v.

ADDUCI, MASTRIANI, MEEKS & SCHILL, et al., Appellees.

No. 93–7215.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1994.

Decided Jan. 17, 1995.

George M. Chuzi, Washington, DC, argued the cause and filed the briefs, for appellant.

Joel P. Bennett, Washington, DC, argued the cause and filed the brief, for appellees.

Before BUCKLEY, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In 1991 appellee Adduci, Mastriani, Meeks & Schill ("AMM & S"), a Washington, D.C. law firm, terminated the employment of one of its senior associates, appellant Cathy Neuren. Neuren filed suit against both AMM & S and its individual partners in the U.S. District Court, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988). At trial, AMM & S offered into evidence both documentary and testimonial evidence relating to Neuren's performance at another law firm prior to her employment with AMM & S, arguing that the evidence both impeached the credibility of Neuren's trial testimony and supported AMM & S's defense that Neu-

ren was fired for legitimate business reasons. The district court admitted the evidence, and a jury subsequently found for the appellee AMM & S. Neuren appeals to this Court, contending that Rule 404 of the Federal Rules of Evidence bars admission of the disputed evidence. Although we agree that the district court erred in admitting the evidence concerning Neuren's conduct in her prior employment, we conclude that the error did not substantially affect the outcome of the case; consequently, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Introduction

Between May, 1989, and August, 1991, Cathy Neuren was a senior associate attorney in the Washington, D.C. office of the law firm of Adduci, Mastriani, Meeks & Schill, a small firm of about 15 lawyers. Neuren, a 1985 graduate of the University of Texas Law School, was previously employed for a brief period with another Washington, D.C. law firm, Dow, Lohnes & Albertson ("DL & A"), but left that firm in 1987. At AMM & S, Neuren specialized in international trade and property litigation before the International Trade Commission. In August, 1991, the partnership decided to terminate Neuren's employment based upon concerns over her difficulty in meeting deadlines and getting along with fellow employees. AMM & S partners notified Neuren of the decision, but kept her on the law firm's payroll until October 31, 1991, in order to ease her re-entry into the job market. In July, 1992, Neuren filed suit in United States District Court, alleging, *inter alia*, that her termination was the product of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988). The case was tried to a jury in October, 1993.

### B. The Evidence at Trial

In attempting to prove sex discrimination, Neuren offered three days of testimony concerning her employment and termination at AMM & S—including testimony from a former co-counsel in a litigation matter, testimony from AMM & S's bookkeeper, Neuren's own testimony, and hostile testimony from an AMM & S partner. Her first witness, Donald Finkelstein, a Los Angeles attorney with whom Neuren worked as co-counsel in a litigation matter, testified that he was unaware of any deadline problems Neuren might have had in working together with him and that she did a "fine job" on their joint project.

Neuren testified that she joined AMM & S after leaving her former employer, DL & A, because she was "wasn't given very much international trade work" at DL & A. She testified that, early in her tenure at AMM & S, two partners reported to her in an evaluation session that the firm was "pleased with [her] work." She did not attend another evaluation session until an April, 1991, meeting with AMM & S partners Vincent J. Adduci and Barbara Murphy. In that session, Neuren testified that Adduci told her that her work was "the best among associates" and that it was "outstanding." Neuren admitted, however, that Adduci and Murphy expressed some concerns about her behavior at the firm. Specifically, they told her that she wasted too much time in casual conversations with the staff and that she should be more prompt in meeting deadlines. She further testified that on August 2, 1991, she was called into a meeting with Adduci and Michael Schaumberg, another AMM & S partner, in which she was informed that she was being fired. Neuren testified that she was not given a reason for the termination during the meeting; instead, the partners allegedly stated that the quality of her work was good. Nevertheless, the firm kept her on the payroll until October 31, 1991, and provided her a letter of reference to aid in her job search.

In order to demonstrate that Neuren's termination was the product of a legitimate, non-discriminatory business decision, AMM & S presented extensive evidence concerning the reason for her dismissal. First, several AMM & S partners testified concerning written evaluations of Neuren prepared by them in which the evaluators expressed grave concerns about Neuren's interpersonal skills and ability to meet deadlines. For instance, Schaumberg testified that several of the partners expressed concerns about "how timely her work was [and] how well she was

getting along with the associates and staff." He further stated that these concerns limited Neuren's prospects of becoming a partner in a small firm like AMM & S. Schaumberg testified that he told Neuren in the August, 1991, termination meeting that the reason for her dismissal was her difficulty meeting deadlines and getting along with co-workers. He stated that Neuren's sex was "absolutely not" a factor in the decision to terminate her. Schaumberg's testimony was corroborated by other partners at the firm. Adduci testified that, in evaluating Neuren's work for him, he rated her timeliness and personal relations with office staff as "unsatisfactory," noting that her "strengths [ ] are overshadowed by her habitual tardiness in turning out work product." AMM & S offered several additional partner evaluations in which these concerns were expressed.

In addition to the evidence concerning Neuren's performance at AMM & S, appellees offered the evidence which is at issue before us: written evaluations of Neuren's work at DL & A and related testimony regarding Neuren's difficulty in getting along with staff and meeting deadlines while an associate at DL & A. One DL & A attorney testified that he had written in his evaluation of Neuren that she "must stick to deadlines and ask more questions when she does not understand the assignment," and that she "is sometimes difficult to work with...." Three other DL & A partners testified that they had given Neuren substantially similar evaluations. Neuren objected to the admission of the evidence, arguing that it unduly prejudiced her because it supported an inference that she would behave in the same manner at AMM & S. The court admitted the evidence over Neuren's objection.

Finally, Neuren offered limited evidence in order to demonstrate that AMM & S's asserted business justification for her termination was simply a pretext for unlawful sex discrimination. She admitted into evidence a 1991 evaluation of her work written by AMM & S partner Jeffrey Meeks, in which Meeks described Neuren's relations with nonlegal staff by writing, "Extremely difficult on secretarial and support staff. A bitch!" Trial Transcript, October 5, 1993 (Morning Session), at 67. Neuren's pretext theory was also based upon evidence that a male associate with like problems at the firm was retained after she was terminated. She testified that she had informed the partners that this associate had allegedly made racist remarks to her on a continuous basis. She presented the testimony of AMM & S bookkeeper Katherine Callwood, who asserted that the male associate spoke to her infrequently because she was black. Callwood admitted on cross-examination that she had never heard the associate make racist remarks, that she frequently worked with her office door closed and locked, and that she had never related her concerns to anyone in the firm. Finally, Neuren elicited testimony concerning this associate's 1991 evaluation by Barbara Murphy, in which she stated that his writing skills needed some improvement and that he would occasionally take too much time on a project if he were not otherwise busy. Murphy later testified, however, that the associate did not exhibit the difficulties in relating to the support staff that Neuren did and has since improved his writing skills.

After considering the evidence from both sides, including the DL & A evidence, the jury determined that AMM & S did not violate Title VII in dismissing Neuren. Neuren appealed to this court, arguing that the district court improperly admitted the DL & A evidence.

## II. DISCUSSION

### A. Impeachment and Character Evidence

■ AMM & S argues that the DL & A evidence was admissible to demonstrate that Neuren had the same difficulties at a previous law firm that she had at AMM & S or, failing that, to impeach her testimony regarding her reasons for leaving DL & A. We review the district court's admission of the DL & A evidence for abuse of discretion, *see Jankins v. TDC Management Corp.*, 21 F.3d 436, 440 (D.C.Cir.1994), and conclude that the district court abused its discretion in admitting the evidence.

AMM & S contends that the district court was correct in reasoning that the DL & A evidence was admissible because it demon-

strated that Neuren had displayed similar work-related problems in her former employment. We disagree. Both AMM & S and the district court misapprehend the Federal Rules' treatment of character evidence. Under Federal Rule of Evidence 404, "[e]vidence of a person's character or a trait of [her] character is not admissible for the purpose of proving that [she] acted in conformity therewith on a particular occasion," except in certain defined circumstances none of which is present here. FED.R.EVID. 404(a). Additionally, Rule 404(a) provides specifically that evidence of prior acts cannot be introduced to prove the character of a person in order to show that she acted in conformity therewith. FED.R.EVID. 404(b). When the district court admitted the DL & A evidence relating to Neuren's difficulties with personal relationships at that firm, it noted that the evidence was "relevant with respect to how she performed at another firm. . . . [AMM & S is] just showing that this is the same problem that this woman had." Trial Transcript, October 7, 1993, at 98–99, *reprinted in* Joint Appendix, at 83–84. Thus, the district court admitted the evidence for the purpose specifically prohibited by Rule 404—as evidence that she acted in conformity with her behavior at DL & A while working for AMM & S.

■ The DL & A character evidence does not fall within any of the exceptions expressly contemplated by Rule 404(b). *See* FED.R.EVID. 404(b) (exceptions for proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). Moreover, appellee's argument that this evidence is admissible because character was "in issue" in the case is equally unavailing. Under the "character in issue" doctrine, character evidence is admissible where character itself is "an element of a crime, claim, or defense." FED.R.EVID. 404(a), NOTES OF ADVISORY COMMITTEE ON PROPOSED RULES. An example of evidence admissible where character is "in issue" is evidence of the chastity of a victim in a prosecution for the crime of seduction where chastity is an element of that crime. *Id.* In this case, AMM & S has not offered a plausible theory under which Neuren's character could be considered an element of its defense. AMM & S's business justification for

Neuren's termination was that she had difficulty in interpersonal relationships with co-workers and in meeting deadlines. Strictly speaking, this defense is based on Neuren's *behavior* at the firm, not her *character.* Consequently, her character was not "in issue" in the sense contemplated by the exception to the rule.

■ AMM & S argues that the DL & A evidence is nonetheless admissible for the purpose of impeaching Neuren's trial testimony concerning her reasons for leaving that firm. Although a party may generally attack the credibility of any witness, FED.R.EVID. 607, and evidence of character and conduct of a witness may be offered for the purpose of impeachment under Rule 608, these rules do not provide the basis for AMM & S's argument nor can they provide a basis for admission of the evidence. Rule 608 restricts the character evidence admissible for impeachment to evidence "refer[ring] only to character for truthfulness or untruthfulness." That Rule obviously does not cover the evidence at issue in the present case referring to Ms. Neuren's alleged traits of tardiness and difficulty in personal relations. Rather, AMM & S's argument relies on Rule 404(b) which provides that evidence, although not admissible to prove character traits of a person in order to "show action in conformity therewith," may nonetheless "be admissible for other purposes." FED.R.EVID. 404(b). Therefore, AMM & S would assert, the evidence of Neuren's past behavior, though inadmissible to support an inference that she acted in conformity therewith in her later employment, is nonetheless admissible for the relevant purposes of rebutting statements in her prior testimony. While the argument may have theoretical validity, it has no applicability to the facts before us.

■ In considering the admissibility of impeachment evidence, we apply the same standards of relevance that we apply to other questions of admissibility. *See Orjias v. Stevenson,* 31 F.3d 995, 1011 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 511, 130 L.Ed.2d 418 (1994). *See also* FED.R.EVID. 401–02. On direct examination, Neuren testified that the reason she left DL & A was

that she was not getting enough international trade work. The DL & A evidence does nothing to impeach that statement. None of the DL & A evidence speaks to the reason for Neuren leaving the firm; rather, it merely explains that Neuren was not given certain assignments because she was difficult to get along with. If this evidence does anything, then, it confirms, rather than rebuts, Neuren's reason for departing DL & A by explaining why she was not getting enough international trade work.

We conclude that the district court erred in admitting the DL & A evaluations and testimony into evidence. The DL & A evidence was not admissible to prove that Neuren acted in conformity with the evidence while working for AMM & S nor is it relevant to impeach her testimony.

### B. Harmless Error and Title VII

■ Our conclusion that the district court erred does not end our inquiry, however. We must next ask whether the district court's erroneous admission of the DL & A evidence prejudiced the outcome at trial or was harmless error. *See* FED.R.EVID. 103 ("Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected.").

■ The harmless error inquiry "involves an assessment of the likelihood that the error affected the outcome of the case.... '[I]f one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.'" *Jordan v. Medley,* 711 F.2d 211, 218–19 (D.C.Cir.1983) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). The application of the harmless error test is fact-specific, depending upon the balance of the evidence bearing upon the issue which the error arguably affected and the centrality of that issue to the ultimate decision. *Jordan,* 711 F.2d at 219. "The proper inquiry is 'whether the error itself had substantial influence. If so, or if one is left in grave doubt, the [verdict] cannot stand.'" *Williams v. U.S. Elevator Corp.,* 920 F.2d 1019, 1023 (D.C.Cir.1990) (quoting *Kotteakos,* 328 U.S.

at 765, 66 S.Ct. at 1248). In order to decide whether the admission of the DL & A evidence was harmless error, then, we must look to the standards for determining whether Neuren's termination contravened Title VII and determine whether the judgment was substantially affected by admission of the DL & A evidence.

■ In *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court described the three-step analysis with respect to the burden of proof in a Title VII case alleging discriminatory treatment. *Id.* at 252–53, 101 S.Ct. at 1093–94 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. In order to meet her prima facie case of sex discrimination in a discharge decision, the plaintiff must demonstrate (1) membership in a protected class, *i.e.,* that she is a woman, (2) performance at or near the employer's legitimate expectations, (3) discharge, and (4) replacement by a person of equal or lesser ability who is not a member of a protected class or, alternatively, the position remains open after termination. *Parton v. GTE North, Inc.,* 971 F.2d 150, 153 (8th Cir.1992). If the plaintiff succeeds in proving the prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. Finally, should the defendant meet this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were rather a pretext for discrimination. *Id.* We evaluate the effect of admission of the DL & A evidence in light of this burden-shifting framework.

Although *Burdine* admonishes that the plaintiff's burden of establishing a prima facie case is "not onerous," *id.,* it is not clear that Neuren has met it here. Though she was a member of a protected class who was discharged and not replaced, she was only

arguably performing near her employer's legitimate expectations. Nonetheless, we assume arguendo that the prima facie case was met. The burden then shifted to AMM & S to come forward with evidence of legitimate, non-discriminatory reasons for the discharge.

Apart from the disputed DL & A evidence, AMM & S produced substantial evidence that Neuren's discharge was for legitimate reasons. Specifically, AMM & S offered testimony regarding several partner evaluations prepared in 1991 in which each partner expressed serious concerns about Neuren's difficulties in meeting deadlines and getting along with co-workers. *See* Trial Transcript, October 5, 1993 (Afternoon Session), at 83–84, 86–94 (testimony of Barbara Murphy); *see also* Trial Transcript, October 6, 1993, at 55, 57–58 (testimony of Michael Schaumberg); *id.* at 105–110 (testimony of Vincent J. Adduci); Trial Transcript, October 7, 1993, at 65 (testimony of Louis Mastriani). When viewing this evidence separately from the DL & A evaluations, we can say with certainty that AMM & S met its burden of production to establish a legitimate business justification for Neuren's discharge.

■ Because it is clear that AMM & S met its burden of production, the burden shifted back to Neuren to demonstrate by a preponderance of the evidence that AMM & S's legitimate business justification was a pretext for unlawful discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. At trial Neuren attempted to establish pretext through both direct and indirect evidence of discrimination. Her direct evidence consisted of a statement in an evaluation by AMM & S partner Jeffrey Meeks in which Meeks described Neuren's interpersonal relations with staff by writing, "Extremely difficult on secretarial and support staff. A bitch!" Neuren also introduced indirect evidence of pretext to support her theory of disparate treatment of a similarly situated male associate. Her evidentiary offer consisted entirely of (1) the statement quoted above; (2) Neuren's own testimony describing as a racist the younger male associate who had been retained by the firm; (3) testimony by the firm's bookkeeper, who asserted her opinion that the male associate did not

speak to her because she was black; and (4) a partner evaluation of the male associate describing problems with his writing style and billing practices. We consider each piece of evidence offered in determining whether Neuren met her burden of proof.

Neuren argues that Meeks' written evaluation of her provides strong direct evidence of sex discrimination, in that it refers to her as a "bitch." We disagree. Although this pejorative term may support an inference that an employment decision is discriminatory under different circumstances, *see Walsdorf v. Board of Commissioners for the East Jefferson Levee District,* 857 F.2d 1047, 1049, 1054 (granting Title VII relief to female employee based upon evidence which included statement by supervisor that "Ain't no bitch going to get this job."), in itself, the term is not always conclusive of sex discrimination. *See Williams v. KETV TV, Inc.,* 26 F.3d 1439, 1441 n. 2 (8th Cir.1994) (affirming judgment for employer on sex and race discrimination despite evidence at trial that personnel involved in hiring decision referred to plaintiff as a "black bitch."); *Moulds v. Wal–Mart Stores, Inc.,* 935 F.2d 252, 253–54 n. 1, 256–57 (11th Cir.1991) (affirming judgment for employer on sex and race discrimination despite evidence at trial that employer told plaintiff she would have to be more of a "bitch" to become manager).

In this case, when considered in conjunction with the accompanying commentary that Neuren was "extremely difficult on secretarial and support staff," Meeks' evaluation of Neuren, though possibly inappropriately phrased, was obviously grounded in gender-neutral concerns about Neuren's interpersonal relations with co-workers, rather than discriminatory considerations. Viewed in its totality, in fact, Meeks' evaluation further supports AMM & S's theory that Neuren was dismissed for her difficulties in getting along with others in the firm. Without other evidence that gender was a factor in her evaluation, this crude word choice does no more to meet Neuren's burden of proof than would any other gender-specific noun.

■ Neuren's indirect evidence offered to demonstrate disparate treatment is equally inadequate. According to Neuren, her limit-

ed evidence to the effect that the firm retained a racist male attorney of whom partners had concerns about his writing and billing practices demonstrates that AMM & S did not treat a similarly situated male attorney in a like manner. Obviously disparate treatment in employment decisions is the very essence of sex discrimination. *See, e.g., Palmer v. Baker,* 905 F.2d 1544 (D.C.Cir. 1990). But Neuren's evidence fails to demonstrate disparate treatment for two reasons: (1) evidence of the firm's response to the male associate's alleged racism was inconclusive, and (2) the evidence as a whole demonstrated that Neuren was not similarly situated to the male associate.

Neuren attempted to paint the male associate as a racist in order to demonstrate that the firm was unwilling to dismiss a male associate who had similar interpersonal difficulties. She testified that the male associate regularly made racist remarks to her and that she reported that problem to AMM & S partner Adduci. She attempted to support her testimony by offering the testimony of Katherine Callwood, who asserted that the associate spoke to her infrequently because she was black. Neuren's evidentiary offer fails to establish that the partnership was unresponsive to the male associate's alleged problems, however. First, Callwood admitted that she never communicated her concerns about the associate's alleged racism to any AMM & S partner, and that she usually worked with her office door closed and locked so that no one could have spoken frequently to her. At most Callwood's testimony evinces personal opinion regarding the male associate's alleged racism without demonstrated foundation. Further, even if her testimony were fully factual, it is irrelevant in establishing that AMM & S did nothing to deal with the problem because she never communicated the problem to any partner.

Second, Adduci testified that Neuren's allegations were immediately discussed with the male associate, that he was warned that racist behavior was grounds for immediate termination, and that no other employee besides Neuren had ever alleged racism on the part of the male associate. Adduci further testified that, several years before Neuren joined the firm, AMM & S had fired a male associate specifically because he made racist comments. Even assuming that the male associate had behaved in a racist manner, an assumption which is no more than speculative, then Adduci's testimony rebuts Neuren's theory that the firm was unresponsive to the male associate's difficulties in getting along with others.

In order to show that she was similarly situated to the male employee, Neuren was required to demonstrate that all of the relevant aspects of her employment situation were "nearly identical" to those of the male associate. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994). Neuren offered no evidence to demonstrate identity of their situations.

First, as discussed above, she presented little credible evidence that the male associate had difficulty getting along with others in the firm. In fact, Barbara Murphy testified at trial that the male associate got along better with co-workers than Neuren. Second, it is undisputed that the male associate was lower in seniority than Neuren; thus, the partners weren't as pressed to make a decision regarding his partnership prospects as they were with Neuren. Finally, Neuren offered partner evaluations of the male associate's work which showed that AMM & S partners were concerned with the associate's legal writing abilities and his tendency to stretch work out when he was not otherwise busy, but these are problems entirely different than Neuren's. Neuren was dismissed for repeated difficulties in meeting deadlines and problems in her relations with staff. Both were viewed as serious difficulties by the firm management, especially in light of the small, personal environment in the firm. The evaluations of the male associate highlight unrelated criticisms which the firm viewed as less serious. Neuren's offer thus failed to demonstrate disparate treatment because the male associate was not similarly situated.

While the DL & A evidence may have had some effect on the jury's weighing of the evidence, we can say with certainty that the DL & A evidence did not have a substantial

impact on the result at trial. Even without consideration of the DL & A evidence, AMM & S provided substantial evidence to meet its burden of production regarding its legitimate, non-discriminatory reasons for Neuren's dismissal, and Neuren provided insufficient evidence to meet her burden of establishing pretext by a preponderance of the evidence.

## III. CONCLUSION

Consequently, although we conclude that admission of the evidence at trial was error by the district court, we are convinced that the error was harmless. The decision of the district court is thus

*AFFIRMED.*