**Soon PARK, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civ. A. No. 92–50 SSH.**

United States District Court,
District of Columbia.

July 6, 1995.

Joel P. Bennett, Washington, DC, for plaintiff.

Bruce P. Heppen, WMATA, Washington, DC, for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

Plaintiff alleges that defendant discriminated against him on the basis of his race and national origin and retaliated against him because he filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 *et seq.*, as amended. The Court held a two-day bench trial beginning on April 3, 1995. This Opinion sets forth the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). Based on the credible evidence presented at trial, the Court finds that defendant did not discriminate against plaintiff nor did it retaliate against him for engaging in protected activity.

### Findings of Fact

Plaintiff, an Asian–American of Korean descent, has been employed with the Washington Metropolitan Area Transit Authority ("WMATA") as a mechanic in the Power Department since 1974. Mechanics are assigned to report to one of three central rail stations—West Falls Church, New Carrollton, and Twinbrook. At the time of the events in question, plaintiff held the position

of AA Leadman at the West Falls Church station (also known as K99) on the midnight shift (10:00 p.m. to 6:00 a.m.). Plaintiff was supervised by John E. Schlager, Sr., a man with whom he had worked in the late 1970's and from mid–1989 to early 1990. Plaintiff described their working relationship as "not good."

On the night of January 2, 1990, Schlager, through the Maintenance Operations Center ("MOC"), directed plaintiff's crew to change the lightbulbs in the tunnel that goes from the Rosslyn station to the Ballston station. Plaintiff and a member of his crew, Sang Han, went to the storage room at the West Falls Church station to obtain lightbulbs, but found that the door was locked. Plaintiff telephoned Schlager and requested a key. While waiting for Schlager to arrive, Han mentioned that he had been paid that evening, which angered plaintiff, who had not been paid. This situation was aggravated by recent events. First, the week before, on December 26, 1989, Schlager had accused plaintiff of failing to follow certain procedures in the repair and replacement of some breakers, which plaintiff felt was wholly unjustified. Second, plaintiff was usually the person designated by Schlager to distribute the checks, yet was overlooked on this occasion.

When Schlager arrived, it was about 1:30 a.m. Plaintiff questioned him about plaintiff's paycheck. Then, Schlager went into the storage room to get the lightbulbs. What happened next is a subject of dispute. Schlager alleges that plaintiff punched him in the arm, a charge that plaintiff denies. In any event, an investigation immediately ensued. Around 2:00 a.m., Schlager called MOC, and requested that security be dispatched to his location. Arthur Flasher, a WMATA police officer, responded to the call, and interviewed plaintiff, Schlager, and Han.

At all times, plaintiff has denied that he hit Schlager, and Schlager has maintained the opposite. Han, who was in the same room with plaintiff and Schlager, and thus in a position to observe what happened, was not thoroughly questioned at the time of the incident because his initial statement "I didn't see anything" was construed by Flasher and others involved in the investigation as meaning that Han was not in a position to see anything, rather than, as Han later contended, that he in fact observed the events in question and that what he observed was that plaintiff did not hit Schlager.

Mark Griffiths, then Acting Superintendent of the Power Department, was informed of the alleged assault early that morning (January 3), and conducted the rest of the investigation. Based on his personal knowledge of plaintiff's previous physical altercations, Schlager's report, and the report of Schlager's doctor, Elie G. Debbas, Griffiths concluded that plaintiff had assaulted Schlager.[1] *See* Defendant's Ex. 23. Griffiths testified that the most convincing piece of evidence was the statement from Dr. Debbas that his January 5 examination of Schlager "revealed him to suffer from a bruise to his left upper arm which is compatible with his complaint." Defendant's Ex. 17. This report was of special significance to Griffiths in this particular case because he had only one person's word against another's.

On January 16, 1990, Griffiths called plaintiff, Han, and Eddie Gregg to his office, and informed plaintiff that due to the January 3 assault, his employment with WMATA was terminated, effective immediately. Plaintiff filed a grievance with his union, Local 689 of the Amalgamated Transit Union. He also filed an administrative complaint with the EEOC on about March 13, 1990. WMATA settled the grievance with the union. Under the terms of the settlement agreement, plaintiff was reinstated effective May 13, 1990, and the period from January 16 to May 12 was deemed a disciplinary suspension with-

---

1. Plaintiff's history of physical altercations with co-workers includes the following. On January 26, 1983, plaintiff and a co-worker, Pyong Y. Min, were involved in an altercation on WMATA property in which Min, for reasons that are not clear, attacked plaintiff with a board, and plaintiff kicked Min in the face. On April 5, 1989, plaintiff allegedly shoved Byung Kim hard enough on his chest to cause him chest pain. Although plaintiff emphasizes that he was not the aggressor in these incidents, the fact remains that plaintiff was involved in these rather serious physical altercations, and the evidence before Griffith substantiated plaintiff's involvement.

out pay based on a finding that plaintiff had assaulted Schlager.

When he returned to work on May 14, 1990, plaintiff was assigned to the West Falls Church station in the position of AA Mechanic, which was a step lower than plaintiff's previous position of AA Leadman. He also was assigned to the evening shift, rather than the midnight shift which he routinely had requested and received prior to his termination. Griffiths testified, and the Court finds credible, that he placed plaintiff in the position of AA Mechanic rather than AA Leadman because of the confusion caused by the "pick" system. Under this system, the employees select a location and shift every six months (December and June), and are granted their choices according to seniority. The "pick" evenly distributes employees throughout the system and throughout the day and night. By the time plaintiff returned, the AA Leadman assignments already had been completed. Griffiths wanted to place plaintiff at West Falls Church, the location plaintiff previously had picked because of its proximity to his home, but, in the interest of avoiding a confrontational situation, did not want to place plaintiff in a position where he would be working with Schlager. When plaintiff brought the problem to the attention of his supervisor, Don Washington, he was placed as a AA Leadman.

In June 1990, another pick was done. Plaintiff picked the AA Leadman midnight shift at the West Falls Church station, but did not get it. Instead, Benny Baker got that slot, who plaintiff complained was less qualified although Baker ranked higher in seniority. Plaintiff complained to the union, and the pick was redone. After the pick was redone, plaintiff received his pick as a AA Leadman in the midnight shift at West Falls Church. As a result, plaintiff was working with Schlager again for the next six month period.

During that period, plaintiff suspected that certain adverse employment actions that occurred were being taken against him in reprisal for his filing of the EEO charge. In

mid-August 1990, plaintiff discovered that his pay had been docked for coming in four minutes late one day in July. Schlager testified that, although he cannot recall the circumstances surrounding that particular disciplinary action, the general policy was that occasional instances of an employee arriving late were overlooked, but that if an individual was habitually late, he would be written up.[2] This policy would have been applied to plaintiff's situation. As there is a complete absence of evidence on the circumstances surrounding plaintiff's tardiness, the Court is unable to determine that this disciplinary action was unjustified.

On August 30, 1990, while plaintiff was out on assignment fixing a breaker, he received a radio call from MOC which he answered. MOC, however, never received plaintiff's call, most likely due to a faulty radio, and plaintiff received a disciplinary notice the next week. The disciplinary action was cancelled when the situation was explained.

On October 3, 1990, plaintiff and Han were assigned to switch three stations (CO5, CO6, and CO7), and completed the tasks in 35 minutes. Schlager gave plaintiff a disciplinary warning for taking too long. Plaintiff protested that two other crew members, Timbrook and Kim, who were assigned to switch only one station, also took 35 minutes yet received no disciplinary warning. Schlager testified that the length of time it takes to complete a switching assignment at a station varies, depending on the location and other variables. He noted that, in his own experience, he has completed five switching assignments while another crew completed only one.

In December 1990, another pick was done. Plaintiff picked the midnight shift at the Twinbrook Station (also known as A13). When he arrived for duty, he found out that AA Leadman Henry Dey had been designated as the Acting Supervisor. Plaintiff felt that he should have been designated Acting Supervisor because he had more seniority than Dey. Plaintiff also felt that Dey should not have been working at Twinbrook because

---

**2.** Although other crew members were tardy and not written up, plaintiff did not present any evidence that their infractions were isolated rather than repeated.

**10**

Twinbrook was the only station to have two AA Leadmen.[3] The testimony of Schlager and Griffiths indicates, as does common sense, that seniority alone does not determine whether an employee is selected as the Acting Supervisor. Rather, the supervisor has the discretion to choose someone he feels is capable. In Griffiths's opinion, Dey was well-qualified for the job.

Plaintiff remained at Twinbrook until the December 1994 pick. At that time, plaintiff picked the midnight shift at the West Falls Church station and was granted his pick.

### Conclusions of Law

#### I. Count One—Discriminatory Discharge

■ Based on the foregoing findings, the Court concludes that plaintiff has failed to prove by a preponderance of the evidence that defendant discriminated against him on the basis of race or national origin when defendant terminated plaintiff's employment on January 16, 1990. To establish a prima facie case of race or national origin discrimination, plaintiff must show that: (1) he is a member of a protected class; (2) he performed at or near the employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a person of equal or lesser ability who is not a member of the protected class or, alternatively, the position remained open. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C.Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The burden then shifts to the defendant to rebut the presumption of discrimination by coming forward with a legitimate nondiscriminatory reason for the adverse employment action, which eliminates the presumption of discrimination. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Then, the plaintiff bears the burden of demonstrating that the asserted reason is false and a pretext for discrimination. *Id.* at ——, 113 S.Ct. at 2752.

**3.** Plaintiff has not demonstrated, however, how the placement of two AA Leadmen at the same

■ First, the Court finds that plaintiff has not established a prima facie case of discrimination because he was reinstated to his position and, therefore, fails to meet the fourth element. Assuming *arguendo* that plaintiff could establish a prima facie case, defendant has come forward with a legitimate nondiscriminatory reason for the discharge—plaintiff's alleged assault on Schlager. It must be emphasized that the issue in this case is not whether plaintiff in fact hit Schlager, but rather whether Griffiths honestly and reasonably believed that plaintiff hit Schlager.

There were many pieces of evidence that supported Griffiths's conclusion that plaintiff hit Schlager: (1) plaintiff's history of becoming involved in physical altercations; (2) Schlager's own account of the incident; and (3) Dr. Debbas's report. Although the investigation was not perfectly done, there was abundant evidence to lead Griffiths to believe that plaintiff had assaulted Schlager. Based on the foregoing and Griffiths's own testimony, the Court finds that Griffiths honestly and reasonably believed that plaintiff assaulted Schlager on January 3, 1990, and that this finding was the reason for plaintiff's discharge.

#### II. Count Two—Reprisal

■ The allocation of burden of proof for a claim of reprisal is similar. To establish a prima facie case:

> [A] plaintiff must show: 1) that he engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two. As in a case of disparate treatment, this initial burden is not great. Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive.... The causal component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.

station indicates retaliation.

*Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985) (quoting, in part, *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984)) (footnotes omitted). After the prima facie case is established, the order of proof then follows the traditional three-part evidentiary framework, *i.e.*, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for the alleged acts of reprisal, and the plaintiff is given the opportunity to prove that the reason is a pretext for retaliation. *McKenna*, 729 F.2d at 790.

 Plaintiff alleges that the following acts were taken in reprisal because of the EEO complaint he filed on March 13, 1990: (1) he was placed in the lower position of AA Mechanic rather than AA Leadman upon his return to work on May 14, 1990; (2) he did not receive his first choice—the midnight shift at West Falls Church—during the June 1990 pick; (3) his pay was docked for arriving at work four minutes late in July 1990; (4) disciplinary action was initiated against him for failing to respond to a radio call that he never received; (5) disciplinary action was taken against him for alleged poor performance on October 3, 1990; and (6) another AA Leadman, Henry Dey, was chosen to be Acting Supervisor instead of plaintiff in December 1990. Although plaintiff has established a prima facie case of reprisal—not an onerous task—WMATA has produced convincing evidence that each adverse employment action was taken for legitimate nondiscriminatory reasons. *See supra* at 8–10. Plaintiff has failed to prove that these reasons were false or a pretext for an illegitimate motive.

## Conclusion

Upon consideration of the foregoing, judgment is entered for defendant on all of plaintiff's claims. An appropriate Order accompanies this Opinion.