Luella S. **CHRISTOPHER**, Plaintiff,

v.

James H. **BILLINGTON**, Librarian of Congress, Defendant.

No. Civ.A. 89–2313 SSH.

United States District Court,
District of Columbia.

April 14, 1999.

Lynne K. Zusman, Washington, DC, for plaintiff.

Madelyn Johnson, U.S. Attorney's Office, Washington, DC, Lana Kay Jones, Associate General Counsel, Office of General Counsel, Washington, DC, for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

Plaintiff, formerly a Library of Congress employee in the Congressional Research Service's Foreign Affairs and National Defense Division, filed this discrimination action on August 16, 1989. Plaintiff asserts that defendant violated her rights pursuant to Title VII of the Civil Rights Act of

1964, as amended, §§ 2000e, *et seq.,* (Title VII), by denying her various fringe benefits, failing to promote her, and terminating her because of her sex, and by retaliating against her for her participation in protected activity. She further contends that defendant violated Title VII by creating a hostile work environment.

There was a protracted period of pretrial litigation.[1] Finally, a trial was held for five days in May 1997; it was resumed and concluded on September 23, 1997.[2] This Opinion sets forth the Court's findings of facts and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).[3] Based upon the credible evidence submitted at trial, the Court finds that defendant did not discriminate against plaintiff in violation of Title VII.

## I. *Findings of Fact*

Plaintiff Luella S. Christopher was employed by the Library of Congress as a foreign affairs analyst in the Congressional Research Service's Foreign Affairs and National Defense ("FAND") Division from 1971 until 1984 when she was terminated. Plaintiff was hired at the GS–7 level and rose to a GS–11 level. Throughout her employment, plaintiff's general duties as an analyst in FAND consisted of answering questions by Congressional clients and preparing analytical reports, memoranda, and other written products on issues of legislative concern.

### A. *Overview of Plaintiff's Job Performance*

In October of 1981, Dr. Richard Cronin became plaintiff's supervisor. On March 31, 1982, Cronin gave plaintiff an oral warning regarding her lack of progress on a project concerning Taiwan ("Taiwan project") which her prior supervisor had assigned to her in April 1981. In that oral warning, Cronin advised plaintiff that she was "by far the least productive member of the Asia/Latin American section" and that her failure to complete the Taiwan project rendered it impractical to assign her other substantive work beyond her rotational assignment to the Congressional Research Unit ("CRU"). Despite this oral warning and despite agreeing to complete the Taiwan project by August 13, 1982, plaintiff subsequently failed to meet the deadline. Consequently, Cronin issued a

---

1. The age of this case is attributable to many factors. The lengthy period of the pretrial litigation was due in part to extensive discovery disputes, primarily stemming from plaintiff's failure to respond to discovery requests (which even prompted defendant to move to compel discovery and request sanctions). In 1991, the Court also granted plaintiff additional time while she took a professional research trip to the Pacific. Furthermore, plaintiff proceeded for much of the case in a pro se status, and the Court granted plaintiff numerous extensions of time in light of her status. Although an attorney, Lynne Zusman, entered an appearance on her behalf on October 1, 1990, the Court permitted her to withdraw approximately a year later due in part to plaintiff's uncooperative and dilatory behavior, this withdrawal then required additional time for plaintiff to seek new counsel. Not until Zusman resumed her representation (apparently on some sort of a pro bono basis) in the fall of 1996 did this case proceed more efficiently.

2. On October 23, 1997, the Court issued an Order regarding the admission of the parties' exhibits into evidence. As noted in that Order, the Court exercised extraordinary leniency because, as the factfinder, the Court would "be fully able to properly evaluate how much weight, minimal or otherwise, should be given each piece of evidence as it consider[ed] the resolution of this action." Upon such consideration, the Court concludes that many of plaintiff's voluminous documentary submissions are of minimal relevance and/or questionable reliability; it does not address those exhibits in this Opinion.

3. The Court notes that the parties' failure throughout this action to agree on the claims being asserted, or to address in a helpful manner why a disconnect continued to exist between their perceptions of the claims, has made the Court's task in writing this Opinion an onerous one. For instance, plaintiff's pretrial statement and her proposed findings of fact and conclusions of law are little more than laundry lists of unfortunate or arguably unfair work-related incidents involving plaintiff since 1971. Nor has defendant aided matters by not addressing those claims which he believes to be meritless.

written warning on August 19, 1982. Cronin then extended the deadline to September 10, 1982, but he informed plaintiff that a failure to improve her performance during a 30–day warning period could subject her to adverse action, possibly including separation. Plaintiff again did not complete the Taiwan project within the required time, but Cronin lifted the written warning because plaintiff satisfactorily completed another project. Ultimately, plaintiff did not complete a draft of the Taiwan project until approximately two years after it was assigned, and even then, it required substantial revision by Cronin.

In January of 1983, Cronin assigned plaintiff the responsibility of maintaining an issue brief on United States–China relations ("China issue brief"). An issue brief is a regularly-updated document of no more than 15 pages, which provides the background of a particular issue, an analysis of its relevance to United States policy or to issues before Congress, and potential policy or legislative options. These issue briefs are intended to serve as succinct, current reference sources for members of Congress, their staffs, or their committees when questions arise regarding particular issues. As both Cronin and plaintiff's witness Jonathan Sanford testified, issue briefs generally should be updated every month.

The China issue brief was updated at least once a month until plaintiff was assigned to it. Although plaintiff updated the brief in January of 1983, she did not do so in February. Because she failed to update the brief without specific instruc-

tion, Cronin testified that, on March 8, 1983, he directed plaintiff in writing to revise and update particular portions of the China issue brief by March 23, 1983. Plaintiff did not complete this assignment or otherwise update the brief throughout the month of March. Furthermore, the only revision she made in April was to change the date on the brief's cover sheet.

On April 28, 1983, Cronin gave plaintiff an oral warning based upon her failure to complete the March 8 assignment or to keep the brief current. Even after taking into consideration plaintiff's CRU duties and any of her health problems, Cronin concluded that plaintiff had had ample time to complete her duties on the China issue brief.[4] He also referred her to the Library of Congress' Health Services Office in case she felt her performance problems were health-related. He then instructed plaintiff to complete the March 8, 1983, assignment by May 6, 1983.

On the same day that Cronin gave plaintiff this oral warning, she requested administrative leave for May 3 and May 4, 1983, to attend a conference on United States–China relations, despite the imminency of the May 6, 1983, deadline. Cronin denied plaintiff's request because he believed it would impede her ability to complete revisions to the China issue brief by the deadline.[5]

Plaintiff subsequently recommended to Cronin that the entire China issue brief be rewritten. Cronin testified that while he agreed with plaintiff that it should be rewritten, he also informed her that she should make necessary updates to the ex-

---

**4.** Although plaintiff complains that her assignments to the CRU generally interfered with her ability to complete her assignments timely and satisfactorily and thus resulted in disciplinary action, the Court finds persuasive defendant's evidence that such assignments were not so onerous as to impede completion of her assignments.

**5.** Plaintiff appears to assert that defendant unfairly disciplined her for inadequate professional growth and outreach because he denied her the very opportunities for growth

and outreach which similarly situated male analysts were provided. This claim relies on two instances in which she was denied the opportunity to attend a conference or to travel: her April 28, 1983, request for leave discussed above and her request for five days of leave to attend a conference in the 1970's. The Court finds that plaintiff has not established that she was entitled to leave on either occasion or that defendant would have granted such leave to similarly situated male analysts.

isting brief until the new brief was completed. On June 13, 1983, plaintiff submitted a design plan during a meeting with Cronin, Dr. Robert Sutter, and another FAND employee. Cronin accepted the design structure and deadlines proposed by plaintiff. The following schedule was adopted: (1) July 25—status review; (2) July 27 to August 5—division office review; (3) August 8 to August 12—front office review; and (4) September 1—delivery to the client.

Dr. Robert Sutter replaced Cronin as plaintiff's supervisor while Cronin was temporarily detailed to the State Department in mid-June of 1983. From June through July, plaintiff assured Sutter that her project was proceeding well, and both Sutter and plaintiff testified that she did not request any help or extensions of the July 25 deadline. When Sutter and plaintiff met at the end of July to discuss her project, however, plaintiff had completed only a few paragraphs of her draft. At that meeting, she informed Sutter that she would be taking a couple of days of annual leave. Sutter extended plaintiff's deadline to August 17, 1983. They met again on August 22, 1983, at which time plaintiff informed him that she had not produced a draft.

Sutter issued a written warning dated August 31, 1983, informing plaintiff that her failure to complete the China issue brief—despite having no other specific assignments for the preceding two and a half months—was unacceptable, and that a failure to present a satisfactory draft within 30 days could result in an adverse action, possibly including separation. Plaintiff received the written warning on September 1, 1983.

### B. *September Denial of Annual Leave*

Later that same day (September 1, 1983), plaintiff requested approximately four weeks of annual leave to sell her house, which was denied.[6] On September 6, 1983, Sutter again denied plaintiff's request, this time made by her union steward, for annual leave or a 30-day extension for completion of the China issue brief.[7] Sutter convincingly testified that he denied plaintiff's request for annual leave because he believed that granting her request would undercut the seriousness of the written warning he had just issued regarding her missed deadlines. Sutter also persuasively testified that completing the China issue brief was a top priority because the rapidly changing U.S.–China relationship had created a heavy demand for the brief, and that granting approximately a month of annual leave would unacceptably delay its completion. Plaintiff disputes that the China issue brief was in heavy demand because she personally received

---

**6.** Plaintiff testified that the annual leave request was effectively a request for emergency leave because of the perceived urgency of selling her house. According to plaintiff, the distinction between emergency leave and annual leave is important because the collective bargaining agreement between the Library of Congress and the union provides that "every effort" should be made to grant leave for family emergencies. However, plaintiff did not provide credible evidence that Sutter knew the request was for emergency leave; she did not show persuasively that she either characterized her request as one for emergency leave or informed Sutter of the circumstances of her request (such as severe illness allegedly caused by water damage to the house) prior to the denial. Even if plaintiff had formally requested emergency leave, Sut-

ter's denial of a request for approximately a month of leave while the requestor was under a written warning for not completing a time-sensitive assignment was entirely justified.

On September 2, 1983, plaintiff requested several hours of emergency leave to deal with court proceedings relating to child support. Although plaintiff appears to contend that such leave was discriminatorily denied, the Court finds that Sutter granted her request (by memorandum) on the same day it was sought.

**7.** The Equal Employment Opportunity Complaints Office (EEOCO) treated September 6, 1983, as the actual date for the action that gave rise to plaintiff's first informal complaint.

few requests for it.[8] The Court finds that Sutter, as a supervisor, was in a far better position to know the overall demand for FAND's work products.

### C. *Recommendation of Separation*

On the last day of the warning period, September 30, 1983, plaintiff submitted her draft of the China issue brief to Cronin, who by then had returned as her supervisor. He immediately reviewed her draft and found it to be utterly unacceptable; Cronin concluded that plaintiff's draft was confusing, did not comply with the structural requirements of the style guide, failed to reference Congressional issues, and contained very little policy analysis. Cronin also sought Sutter's opinion (who was on temporary assignment outside of the Library of Congress); he agreed that plaintiff's effort was unsatisfactory. On the same day he received the draft, Cronin orally informed plaintiff of his intent to recommend her separation. He reiterated that position in writing on October 5, 1983. Cronin convincingly testified that he recommended separation rather than a lesser sanction because:

> [T]his was one more milestone in what had been a very long and very painful process of trying to get Dr. Christopher to be responsive to her duties. . . . [H]ad I accepted that draft as a beginning point for further work on her part, . . . the cycle would have continued, of delay, failure to perform on schedule. . . . I just was not prepared to go through that cycle again. I had been through two cycles of oral warning, written warning[,] oral warning, written warning. And the first cycle, I had removed the warning before Dr. Christopher actually fulfilled all of the requirements that were laid down. And I did that, trying to recognize that there had been im-

provement in her performance, and that she had accomplished some specific assignments.

> By the end of this second cycle of oral warnings and written warnings, it was clear to me that Dr. Christopher, in my own mind, anyway, would only do what was either absolutely required to protect her interest in her job in the most minimal way, or what she thought in her own mind that it was important for her to do. But that it was—to me it was just a hopeless task of trying to . . . get her to assume her responsibilities and to take responsibility for her own . . . job.

May 22, 1997, Tr. at 41–42. Furthermore, Cronin believed, as did Sutter, that it was important to maintain a current version of the China issue brief and that plaintiff's failure either to draft a new brief or to maintain the old one could damage FAND's reputation.

On November 2, 1983, Stanley Heginbotham, Chief of FAND, issued a Notice of Proposed Adverse Action informing plaintiff that he concurred with Cronin's conclusion that she had not fulfilled her duties and that he was recommending her separation. On February 10, 1984, Gilbert Gude, Director of the Congressional Research Service, notified plaintiff by letter that he accepted the separation recommendation and that her removal would be effective as of March 30, 1984. Plaintiff was terminated on that date.

Throughout these events, plaintiff took actions to protect her interests. After her September leave request was denied, she filed an informal complaint with the Library of Congress' Equal Employment Opportunity Complaints Office (EEOCO) on October 3, 1983. After Cronin recommended her separation, she filed a second informal complaint with the EEOCO on

---

8. Plaintiff also contends that the need for a current China issue brief was not urgent because a version of the original China brief was used for approximately a year after her separation was proposed. However, updates were made to the existing brief after plaintiff was removed from it, and the Court finds that plaintiff has not established that these updates were insufficient to ensure the accuracy and currency of the existing China issue brief until a new brief was completed.

November 3, 1983. In both administrative complaints, plaintiff alleged that defendant's actions were the result of sex discrimination and other bases of discrimination not prohibited by Title VII.[9] After Gude notified plaintiff that he accepted the separation recommendation, plaintiff filed a formal complaint with the EEOCO on March 19, 1984, consolidating the two previous informal complaints. After plaintiff was terminated, she appealed the termination pursuant to the terms of the collective bargaining agreement between the Library of Congress and her union. Plaintiff's union action, which did not include equal employment opportunity issues, was successful, and plaintiff was reinstated with half of the back pay which she had lost. The EEOCO, however, ultimately concluded that she had not been discriminated against on the basis of gender and issued a right-to-sue letter on January 23, 1989. Plaintiff thereafter filed her suit in this Court and attempted to demonstrate at trial that defendant had discriminated against her on the basis of sex through evidence of disparate treatment.

## II. *Conclusions of Law*

As noted at the beginning, plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII"). Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It is uncontested that defendant is an "employer" and plaintiff is an "employee" for the purposes of Title VII. The Court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331.

### A. *Scope of the Action*

Plaintiff seeks relief for three types of claims. First, plaintiff's *pro se* complaint, construed broadly, asserts that defendant discriminated against her on the bases of sex, marital status, nondisqualifying physical handicap, and union activity. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (*pro se* pleadings should be construed liberally). Because Title VII does not provide protection from discrimination based upon any of the asserted bases of discrimination except gender, the Court treats plaintiff's complaint as presenting only claims of sex discrimination.[10] *See* 42 U.S.C. § 2000e–2(a)(1) (prohibiting discrimination based on an individual's race, color, religion, sex, or national origin); *see also Williamson v. Shalala*, 992 F.Supp. 454, 459 (D.D.C.1998) (Title VII does not cover handicap-based discrimination), *aff'd per curiam*, 1998 WL 545420 (D.C.Cir. July 20, 1998); *Greer v. Brown*, 1994 WL 248234, at *2 (D.D.C. May 23, 1994) (Title VII does not apply to discrimination based upon marital status). Second, plaintiff's judicial complaint alleges a delay in the EEOCO's processing of her administrative complaint, although plaintiff does not allege specifically that the delay was due to unlawful discrimina-

---

**9.** These other bases include marital status, nondisqualifying physical handicap, and union activity. While not prohibited by Title VII, these bases were prohibited discriminatory practices in the collective bargaining agreement between the Library of Congress and plaintiff's union.

**10.** As to plaintiff's allegation of handicap-based discrimination, she also may not assert federal claims of handicap-based discrimination pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*, which had not been enacted at the time of the challenged

conduct. Nor may plaintiff assert her allegation of handicap-based discrimination pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, which did not protect Library of Congress employees at the time of the challenged conduct. *See Judd v. James H. Billington*, 863 F.2d 103, 105 (D.C.Cir.1988). Furthermore, plaintiff appears to have conceded that any claims relating to her health problems must be grounded solely on the theory that defendant reacted differently to her compared to similarly situated males.

tion or retaliation. Third, in subsequent pleadings and at trial, although not in her judicial complaint, plaintiff asserts a hostile work environment claim.

### 1. *Exhaustion of Administrative Remedies*

The claims that a plaintiff may assert in a Title VII lawsuit are limited by the requirement of exhaustion of administrative remedies. Before filing a Title VII suit in federal court, a plaintiff must file an administrative complaint with the agency being charged with the violation. *See* 42 U.S.C. § 2000e–16(c) (authorizing the commencement of a civil action after the receipt of a notice of final action by an agency); *McRae v. Librarian of Congress,* 843 F.2d 1494, 1496 (D.C.Cir.1988) (*per curiam*). If the plaintiff subsequently files a lawsuit, her claims are restricted to only those claims that are asserted in the administrative complaint and that are " 'like or reasonably related to the allegations of the charge and [which grow] out of such allegations.' " *Park v. Howard University,* 71 F.3d 904, 907 (D.C.Cir.1995) (quoting *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994)). Requiring that a plaintiff assert in an administrative complaint all charges that could form the basis of a lawsuit provides the charged party with notice of the claim and helps "narrow the issues for prompt adjudication and decision." *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 472 n. 325 (D.C.Cir.1976). Although this requirement should not be construed as a heavy procedural burden, a plaintiff must state her charges with some degree of specificity, and a court should not interpret an administrative charge so liberally as to permit a plaintiff to bypass the Title VII administrative process. *Park,* 71 F.3d at 907; *see Loe v. Heckler,* 768 F.2d 409, 417 (D.C.Cir.1985).

The Court must therefore determine whether the claims before the Court were asserted, or are "like or reasonably related to the allegations," in plaintiff's administrative complaint. Plaintiff's first informal administrative complaint, submitted October 3, 1983, alleged that Sutter's denial of leave in September of 1983 was motivated by sex discrimination. Plaintiff's second informal complaint, dated November 3, 1983, alleged that the recommendation of termination was the result of gender-based discrimination. Plaintiff's formal administrative complaint, filed on March 19, 1983, consolidated the two informal complaints and stated the specific grounds of her charges of discrimination. The formal complaint stated in part that she was discriminated against because she "was not granted (a) protection under Title VII of the 1964 Civil Rights Act of [her] rights; (b) the same opportunities for professional outreach, advancement and recognition as [her] male colleagues; (c) leave to attend to family emergencies that were beyond [her] control, despite the FAND division's knowledge of the problems and of my status as a female single parent/sole head of household; (d) the counseling, assistance, support and consideration from FAND management, health unit, and other Library of Congress officials in dealing with [her] health problems."

Considering the content of the administrative complaints, the Court concludes that plaintiff's claims of sex discrimination made in her judicial complaint and at trial (that defendant denied her promotions, opportunities for travel and for professional and educational growth, various types of leave, and that defendant disciplined and terminated her) are within the scope of her formal administrative complaint, and thus they are appropriate for adjudication.

The Court concludes, however, that plaintiff's hostile work environment claim was never asserted in an administrative complaint, and thus that claim is not properly before the Court. The mere assertion of sex discrimination in plaintiff's administrative complaint—in the absence of factual or legal allegations of a sexual harassment claim—is insufficient to sup-

port a claim of a hostile work environment. *See Park*, 71 F.3d at 907–909 (plaintiff's national origin hostile work environment claim was not within the scope of plaintiff's administrative complaint alleging national origin discrimination).[11]

■ The Court also concludes that plaintiff's claim regarding the EEOCO's delay in processing her complaint was not included in any administrative complaint, and therefore is not properly before the Court. Any claim asserting that the EEO-CO itself unlawfully discriminated or retaliated against plaintiff by delaying the processing of her complaint is also not "like or reasonably related to the allegations" in plaintiff's administrative complaints, and does not grow out of the allegations made

in those complaints in such a way that the " 'administrative investigation that [could] reasonably be expected to follow the charge of discrimination' " would have included it. *Id.* at 907 (quoting *Chisholm v. United States Postal Service*, 665 F.2d 482, 491 (4th Cir.1981)).

### 2. *Untimeliness*

Not only must a plaintiff have asserted her claims in an administrative complaint before proceeding in federal court, but generally she must also comply with Title VII's timeliness requirements. *See Jarrell v. United States Postal Service*, 753 F.2d 1088, 1091 (D.C.Cir.1985). At the time of the events in question, plaintiff was required to notify the agency of her administrative charge within thirty days of the

---

**11.** Even if the Court were to conclude that this claim was within the scope of plaintiff's administrative complaint, the claim would have been barred because she did not complain about the conduct in a timely manner. *See Jarrell v. United States Postal Service*, 753 F.2d 1088, 1091 (D.C.Cir.1985) (noting that a timely administrative complaint is generally a prerequisite to filing suit). The timeliness requirement is discussed in the next section of this Opinion.

Even had plaintiff's claim been within the scope of the administrative complaint and had been timely made, plaintiff's allegations do not state a viable hostile work environment claim. A hostile work environment claim requires a showing of "severe or pervasive conduct." *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). To be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). To determine whether an environment is sufficiently hostile or abusive, a court must consider all the circumstances including the "frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Because Title VII is not intended to be a general civility code, " 'simple teasing,' offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Id.* (internal citation omitted).

Plaintiff's hostile work environment claim is based primarily on her allegations of: (1) a questionnaire issued to employees by the FAND social committee inquiring whether the Christmas party should be restricted to employees and other adults including "wives, husbands, boyfriends, girlfriends, mistresses, etc."; (2) the public presentation of a gag Christmas gift of a plane ticket to Guam, the residence of plaintiff's daughter's father (to whom plaintiff had never been married); and (3) a play in which a character seeking a sexual interlude with a superior was given her name. Plaintiff has not established that a reasonable person would find the first two incidents to be sexually hostile or offensive. The first incident is so clearly innocuous that it merits no discussion. Although the second incident was insensitive, there is no indication that the joke was made because plaintiff is a woman.

The third incident, though more offensive than the other asserted conduct and carrying sexual overtones, is not sufficiently severe by itself to support a hostile work environment claim. Although the testimony is unclear, it appears that this incident was an isolated event, and that it occurred in the 1970's, long before the other incidents relevant to this action. Accordingly, even had plaintiff properly asserted a hostile work environment claim, the Court would conclude that she did not demonstrate the "severe or pervasive" misconduct necessary to prevail.

challenged conduct. *See* 29 C.F.R. § 1613.214(a)(1); *Valentino v. United States Postal Service,* 674 F.2d 56, 65 (D.C.Cir.1982) (noting the time within which a federal employee was required to contact an agency counselor after the occurrence of allegedly discriminatory conduct). Accordingly, even assuming that plaintiff's March 19, 1984, formal complaint asserted all the grounds contained in her October 3, 1983, informal complaint, only conduct occurring on or after September 3, 1983, could form the basis of a viable Title VII claim. Such conduct includes only two acts: (1) the denial of plaintiff's September request for personal leave, and (2) the November Notice of Proposed Adverse Action which resulted in her termination.

▮▮▮▮ In contrast, plaintiff's allegations of conduct that occurred before September 3, 1983, are time-barred and cannot be considered in this action. Although an individual who untimely files an administrative discrimination complaint "ordinarily will be denied a judicial audience," plaintiff contends that her time-barred claim should be treated as timely filed because the conduct constituted a continuing violation of Title VII. *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 717–18 (D.C.Cir.1978); *See also Milton v. Weinberger,* 645 F.2d 1070, 1076 (D.C.Cir.1981). To recover on a theory of continuing violations of Title VII, plaintiff must prove either a "series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitation] period." *Palmer v. Kelly,* 17 F.3d 1490, 1496 (D.C.Cir.1994); *see also Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1422 (D.C.Cir.1988). The first question in analyzing a claim is whether an actual violation of Title VII occurred within the limitations period. *Palmer,* 17 F.3d at 1496 (citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) ("[T]he emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists.")). The second question is whether the discriminatory act either was part of a series of related discriminatory acts or was caused by a discriminatory system in effect before and during the limitations period. *Id.* (citing *Berger,* 843 F.2d at 1422). Plaintiff therefore may include her untimely claims only if she proves that those claims are part of a series involving the two timely claims, so long as the two timely claims indeed were violations of Title VII.[12] For reasons discussed in Part C of this Opinion, the Court concludes that plaintiff has not demonstrated that these two actions violated Title VII. Because the Court concludes that no discriminatory acts occurred within the limitations period, it need not reach the second step of the analysis.[13] The Court therefore will not consider the untimely claims in this action.

---

**12.** In addition, it is unclear whether plaintiff was denied a promotion review during the limitations period and, if so, whether such a denial could have constituted a discriminatory act for the purposes of the theory. Regardless, the Court summarily rejects any promotion-based claim because plaintiff has not established that she was denied a promotion review during the limitations period, or that she even had a right to one. The Court finds that plaintiff voluntarily and knowingly waived her right to promotion review on December 4, 1980, that she did not withdraw that waiver until long after the events relevant here, and, in the absence of such a withdrawal, that she was not eligible for promotion review.

**13.** Nonetheless, the Court notes that plaintiff has not established the existence of any discriminatory system within the statutory period. Plaintiff's submissions of raw figures regarding the gender breakdown of positions held, various types of leave and travel taken, and disciplinary actions taken are entirely inadequate in the absence of contextual information such as (1) whether qualified women applied for positions, leave, or travel, and were rejected, (2) what conduct prompted the disciplinary actions, and (3) what the disciplinary and performance records were of the disciplined individuals. *See Valentino,* 674 F.2d at 68.

### B. *Title VII Allocation of Burdens and Presentation of Proof*

To prove a case of discriminatory treatment, a Title VII plaintiff must follow a specific burden-shifting structure. The Supreme Court first set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff has the initial burden of proving a *prima facie* case by a preponderance of the evidence. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To satisfy that burden, a plaintiff must show actions by the defendant which the Court may infer were more likely than not to have been based on discriminatory factors illegal under Title VII. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

If the plaintiff is successful, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. This burden is one of mere articulation and is satisfied if " 'he simply explains what he has done' or produc[es] evidence of legitimate nondiscriminatory reasons.' " *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer satisfies his burden of articulation, then he has rebutted the presumption raised by the *prima facie* case, and the "factual inquiry proceeds to a new level of specificity." *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089).

Once the defendant has articulated a legitimate nondiscriminatory reason for its conduct, it is no longer relevant whether the plaintiff made out a prima facie case of discrimination, and the Court must determine whether the plaintiff has met her ultimate burden of persuasion, which she bears at all times. *Id.; Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553–54 (D.C.Cir.1997). The burden of persuasion requires the employee to show that the employer's proffered reason for the employment decision was not the real reason, but merely a pretext for a discriminatory purpose. *Id.*

 A plaintiff may satisfy this burden of persuasion by either producing direct evidence of discriminatory intent or demonstrating that similarly situated men and women received disparate treatment. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513–1514 (D.C.Cir. 1995). If the plaintiff seeks to establish discriminatory intent through evidence of disparate treatment, she first must demonstrate that she or other women were similarly situated to male employees who received more favorable treatment. To do this, the plaintiff must show that "all of the relevant aspects of [the] employment situation were 'nearly identical' to those of the male [employees]." *Id.* at 1514; *see also Mungin*, 116 F.3d at 1554. When statistical evidence is offered in support of a disparate treatment claim, its "usefulness depends on all of the surrounding facts and circumstances." *International B'hood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Valentino*, 674 F.2d at 68.

### C. *Claims of Discrimination*

As noted above, the question of whether the plaintiff has established a *prima facie* case of discrimination is irrelevant where the defendant satisfies its burden of articulating a legitimate, nondiscriminatory reason for its conduct.[14] *See Mungin*, 116

---

**14.** The Court notes that plaintiff has not satisfied the initial burden of establishing a *prima facie* case of discrimination essentially for the same reasons proffered by defendant for his actions—that she was neither entitled to the requested annual leave nor qualified to retain her job. The Court therefore will not address in detail the question of whether plaintiff es-

F.3d at 1554. The Court concludes that defendant clearly has satisfied his burden of articulating legitimate, nondiscriminatory reasons for the two actions at issue, *i.e.,* defendant's September denial of leave and its November proposal of separation which resulted in plaintiff's termination. Regarding the denial of leave, it is entirely reasonable for a supervisor to consider an employee's ability to complete her work responsibilities when evaluating a request for annual leave, and defendant's evidence shows that plaintiff had a poor record of completing her assignments in a timely manner. The Court finds that plaintiff has not demonstrated that she was entitled to take annual leave because she has not established that her workload permitted it. Regarding the recommendation of separation, the Court finds that Cronin legitimately believed that plaintiff had been given every reasonable opportunity to meet her responsibilities. Cronin relied specifically on plaintiff's failure to satisfy the requirements of the August 31, 1983, written warning issued by Sutter and more generally on her history of substandard job performance relating both to the maintenance and drafting of the China issue brief and the drafting of the earlier Taiwan project. These bases for proposing separation are completely legitimate and nondiscriminatory. The Court concludes that defendant has satisfied his burden of articulation.

Plaintiff must therefore persuade the Court that defendant's proffered reasons were a mere pretext for a discriminatory purpose. *See Mungin,* 116 F.3d at 1553–54. Lacking credible direct evidence of discrimination, plaintiff seeks to prove a discriminatory purpose by showing that similarly situated men received disparate treatment with regard to both her denial of leave and her proposed separation. She relies on individual testimony and statistics in support of her disparate treatment claims. For reasons discussed below, the Court concludes that plaintiff has not demonstrated that defendant's proffered reasons were merely a pretext for some discriminatory purpose.

### 1. *Denial of Leave*

Plaintiff attempts to prove that defendant's asserted reasons are pretexts for discrimination through two pieces of indirect evidence. First, plaintiff contends that defendant failed to comply with the relevant provisions of the collective bargaining agreement between her union and the Library of Congress regarding the leave requests, and that such a departure suggests discrimination. *See Kolstad v. American Dental Assoc.,* 108 F.3d 1431, 1436 (D.C.Cir.1997) (recognizing that an employer's violation of its own procedures may be relevant to the question of discriminatory intent). Second, she submits evidence purporting to show that similarly situated men were routinely granted various types of leave which she was denied. *See Neuren,* 43 F.3d at 1514 ("[D]isparate treatment in employment decisions is the very essence of sex discrimination.").

The Court first addresses plaintiff's contention that her supervisor Sutter failed to comply with the standards established by the collective bargaining agreement. Article XX, Section 5 of the collective bargain-

---

tablished a *prima facie* case of discrimination because it concludes that defendant has satisfied his burden of articulating legitimate nondiscriminatory reasons for his conduct. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (establishing the elements of a *prima facie* case for a Title VII nonpromotion claim: plaintiff "must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.");

*see id.* at n. 6 (noting that the elements of plaintiff's *prima facie* case must be applied flexibly to the particular situation involved.); *see also Neuren,* 43 F.3d at 1512 (stating the elements of a *prima facie* case for a termination claim: "(1) membership in a protected class ..., (2) performance at or near the employer's legitimate expectations, (3) discharge, and (4) replacement by a person of equal or lesser ability who is not a member of a protected class or, alternatively, the position remains open after termination").

ing agreement provides that annual leave should be granted to the greatest extent possible consistent with an employee's workload. Plaintiff was placed under a written warning for nonperformance of her work responsibilities on the same day she later requested approximately four weeks of annual leave. In light of her warning status and her failure to update or rewrite the China issue brief at a time of intense Congressional interest in China, the Court finds that Sutter's denial of plaintiff's request was eminently reasonable and clearly did not violate the collective bargaining agreement. Although plaintiff would have the Court substitute its judgment for Sutter's regarding the importance of the China issue brief and his consideration of that factor in evaluating whether to grant leave, the Court may not " 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (quoting *Milton*, 696 F.2d at 100). As noted in the Findings of Fact, the Court finds Sutter's testimony regarding the importance of, and heavy demand for, the China issue brief to be entirely convincing.

Plaintiff's second argument that defendant acted in a discriminatory manner asserts that similarly situated men were granted various forms of leave while her requests were denied. As noted earlier, plaintiff must establish that a man was "similarly situated" by showing that all relevant employment circumstances were virtually identical. *Mungin*, 116 F.3d at 1554; *Neuren*, 43 F.3d at 1514. Because different factors are considered depending upon the type of leave requested, the Court finds that only male analysts requesting annual leave could be similarly situated to plaintiff.[15] The Court concludes that plaintiff has not established that Sutter or any other Library of Congress supervisor ever granted annual leave—much less approximately four weeks of such leave—to a male employee who was under a written warning for nonperformance of his duties. The Court further notes that plaintiff's submission of tables simply listing the amount of sick and annual leave taken by various employees over several years is completely lacking in probative value in the absence of relevant contextual information. *See Valentino*, 674 F.2d at 68. Plaintiff has fallen far short of demonstrating disparate treatment regarding the evaluation of requests for annual leave by similarly situated men and women. Accordingly, the Court concludes that plaintiff has not established that defendant discriminated against her in violation of Title VII by denying her September request for annual leave.

15. Even if discriminatory intent could be inferred from defendant's allegedly disparate treatment of men and women regarding forms of leave other than annual leave, the Court finds that plaintiff has not demonstrated that either she or women in general were treated differently from similarly situated men in the granting of such leave. Although plaintiff testified about a couple of instances in which sick leave was denied to her, she did not establish that she properly requested or was entitled to sick leave, or that similarly situated men were granted such leave. She provides no credible evidence that women's requests for sick leave were treated less favorably than men's.

Plaintiff also testified that requests for administrative leave for various purposes—such as health-related activities, work-related travel, attendance at conferences, and other things—were routinely granted to men while similarly situated women were denied such leave. Again, plaintiff has provided no credible evidence that any supervisor improperly denied her administrative leave or that a similarly situated man was granted leave. Although plaintiff has submitted tables listing the amount of administrative leave granted for travel for various employees over a period of years, plaintiff has not provided any contextual information relevant to granting such leave from which the Court could infer disparate treatment of men and women. Furthermore, these tables indicate that Marjorie Neihaus—a woman in the same 5- or 6-person section working under the same supervisors as plaintiff—received significant administrative leave for travel. The Court finds that plaintiff's evidence does not lend any support to her contention that Sutter's denial of her September leave request was based upon a discriminatory motive.

### 2. *Separation*

Plaintiff makes two allegations in support of her argument that defendant's reasons for her separation were merely pretextual for a discriminatory purpose. First, she contends that she received oral and written warnings for conduct which similarly situated males did not, and that these warnings resulted in her ultimate separation. Second, she contends that, even if the underlying formal warnings were warranted and Cronin's evaluation of the September 30, 1983, draft of the China issue brief were correct, the sanction of separation was too severe in comparison to disciplinary actions taken against similarly situated males.

Plaintiff first contends that similarly situated male analysts were not formally disciplined for failure to meet deadlines on anticipatory briefs. Testimony presented by both plaintiff and defendant established that deadlines for anticipatory projects were more flexible than those for client projects and were frequently changed with the consent of supervisors. Plaintiff did not establish, however, that a supervisor could not legitimately enforce—through formal disciplinary action—deadlines for such anticipatory projects when the circumstances merited it, as the Court finds that Cronin and Sutter reasonably did. As noted previously, the Court may not second-guess a personnel decision absent demonstrably discriminatory motive. *Fischbach,* 86 F.3d at 1183; *Milton,* 696 F.2d at 100.

Plaintiff unsuccessfully attempts to establish a discriminatory motive by showing that neither Sutter nor Cronin ever formally disciplined a male analyst for failing to meet a deadline on an anticipatory brief. Although Sutter testified that plaintiff was the only person to whom he ever issued a formal warning, the Court finds persuasive his testimony that no other employee whom he supervised ever behaved in a way meriting such a warning. Furthermore, plaintiff did not prove that any male analyst under Sutter's supervision ever missed a due date on an anticipatory project, much less missed a due date after receiving an extension while under an oral warning for nonperformance. *See Shelborne v. Runyon,* 1997 WL 527352, at *5 (D.D.C. Aug.21, 1997) (plaintiff was not similarly situated to an employee who had a better attendance record); *see also Perkins v. Brigham & Women's Hospital,* 78 F.3d 747, 751 (1st Cir.1996) (plaintiff not similarly situated to an employee whose conduct was less serious and who lacked a record of disciplinary problems). Accordingly, the Court finds that plaintiff has not established that Sutter treated any similarly situated male more favorably. *See Mungin,* 116 F.3d at 1554; *Neuren,* 43 F.3d at 1514.

Cronin, on the other hand, while also testifying that plaintiff was the only analyst to whom he had ever issued an oral or written warning for failure to comply with deadlines for anticipatory projects, testified that possibly three analysts under his supervision had not met such deadlines and were not issued warnings. Two of those three analysts, however, were women, and therefore any favorable treatment of them certainly does not suggest disparate treatment. The third analyst, Larry Storrs, was male, but was not similarly situated to plaintiff because any tardiness on his part was due to an unusually heavy workload and because he kept Cronin advised of any potential problems regarding compliance with deadlines; furthermore, Storrs requested extensions rather than simply missing deadlines as plaintiff did.

The Court also concludes that plaintiff has not established that Cronin or Sutter treated her more harshly than other male analysts in formally disciplining her for missed deadlines because she did not demonstrate that enforcing deadlines was as important for any male analyst's anticipatory project as it was for hers. For instance, the Court finds that plaintiff showed no instance in which a male analyst's delay in completing an initial draft of an assignment had been so extensive as to

necessitate a warning. Plaintiff, in contrast, delayed a year in producing a draft on the Taiwan project, which prompted Cronin to issue an oral warning, and she then delayed even further, resulting in a written warning. The Court finds that stricter enforcement of deadlines for an extremely tardy analyst than for those who are reasonably timely does not raise an inference of discrimination. Furthermore, the nature of the China issue brief distinguished it from the anticipatory project of other analysts who missed deadlines on anticipatory briefs without formal sanction. First, as noted previously, the Court finds convincing Cronin's and Sutter's testimony regarding the high level of Congressional interest in the China issue brief and their concern about the need for a current version of the brief. As they persuasively testified, the presence of an outdated issue brief on such an important issue might well have damaged FAND's reputation with its clients. Accordingly, in light of plaintiff's failure to updating the existing China issue brief timely and satisfactorily, enforcement of deadlines (initially set by plaintiff herself) for the new China issue brief was clearly justified.

Plaintiff also contends that similarly situated male analysts who had health problems which affected their ability to perform their job responsibilities were treated more leniently than she was. Had the same lenient standards applied to her, she argues that she would not have been subjected to formal warnings or termination. Plaintiff bases this claim on two assertions. First, she contends that defendant denied her formal requests for sick leave. Despite vague testimony at trial regarding "numerous" instances on which she had been denied sick leave unfairly, plaintiff fails in her proposed findings of fact and conclusions of law to point to any specific instance where she properly made a formal request for sick leave and was denied. Furthermore, the Court finds that even had defendant wrongfully denied any such requests, the leave at issue was so minimal in amount (or was actually taken as other forms of leave) that their denial would not have affected plaintiff's ability to complete her assignments timely and satisfactorily, and thus would not have contributed to the disciplinary actions taken against her. The Court finds that plaintiff has not provided any credible evidence that she properly applied for and was denied sick leave which would have been granted a similarly situated male analyst, or that denying her requests for sick leave resulted in her failure to timely and satisfactorily complete the assignments with respect to which she was disciplined. Accordingly, the Court concludes that plaintiff has not established that disparate treatment regarding the grant of sick leave contributed to her ultimate termination.

Secondly, plaintiff also argues that male analysts with health problems were treated more leniently because defendant informally accommodated the health-related problems of other male analysts by lowering the required standard of work performance. Relying on the experiences of Jonathan Sanford, Harry Wrenn, and Andrew Mayer, plaintiff contends that defendant tolerated substandard performance by similarly situated male analysts suffering from medical problems while she received no such leniency. The Court finds, however, that plaintiff did not demonstrate that these men were similar to her, *i.e.*, that they: (1) were under the authority of her immediate supervisors; (2) repeatedly missed deadlines without first receiving extensions from their supervisors; (3) did not keep their supervisors abreast of any health problems and potential work-related effects in a timely fashion; (4) failed to take advantage of available forms of relief such as sick leave or applying for light duty; or (5) produced minimal and unsatisfactory work product despite having been given far more time to complete her assignments (as Cronin testified) than would normally have been given.[16] In light of

16. Plaintiff also argues that a male analyst— Royce Crocker—received an orthopedic chair

the foregoing, the Court concludes that plaintiff has not established that these men were similarly situated to her because their relevant employment circumstances were not nearly identical to hers. *Mungin*, 116 F.3d at 1554; *Neuren*, 43 F.3d at 1514.

Finally, plaintiff contends that the severity of the separation sanction itself is evidence of discriminatory intent. Although plaintiff submitted evidence that lesser sanctions were available and that defendant rarely resorted to termination, plaintiff has not convincingly rebutted defendant's evidence that a lesser sanction would have resulted only in a temporary improvement in plaintiff's performance. As Cronin persuasively testified, plaintiff had already been through two cycles of oral and written warnings within a two-year period, yet she had failed not only to demonstrate any sustained improvement in her performance, but also to satisfy the requirements of her second written warning. Plaintiff provided no credible evidence that any male analyst with a record of nonperformance even approaching that of plaintiff existed, and, therefore, she has not established that similarly situated male analysts received lesser sanctions.[17] Accordingly, the Court concludes that plaintiff has not established that defendant discriminated against her on the basis of her gender in violation of Title VII by taking adverse actions against leading up to and including her termination.

### III. *Conclusion*

In conclusion, for all of the foregoing reasons, the Court finds that plaintiff has not demonstrated by a preponderance of the evidence that defendant violated Title VII by discriminating against her on the basis of her sex. An appropriate Judgment accompanies this Opinion.

### *JUDGMENT*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that judgment is entered in favor of defendant.

SO ORDERED.

while her request for one was denied, and that this fact constitutes disparate treatment supporting an inference of discriminatory intent. The Court rejects this example because plaintiff has not demonstrated that Crocker was situated similarly to her. First, Health Services rejected plaintiff's request for an orthopedic chair because she did not provide adequate documentation for its need and because the unit had no further available funds to purchase such chairs. Crocker testified that he submitted a medical form to his supervisor (not Cronin or Sutter) and promptly received an orthopedic chair. Furthermore, plaintiff did not establish that the decisions on the requests for orthopedic chairs were made by the same decision-maker. *See Phillips v. Holladay Property Servs., Inc.*, 937 F.Supp. 32, 35 (D.D.C.1996) (employees with different supervisors are not similarly situated), *aff'd*, 1997 WL 411695 (D.C.Cir. Jun.19, 1997); *see also Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir.1997) (same).

Even had plaintiff established that Health Services was the decision-maker regarding both requests for chairs, she did not show that Health Services was experiencing similar funding constraints when it granted Crocker's request. Accordingly, the Court concludes that evidence regarding plaintiff's failure to receive an orthopedic chair does not support plaintiff's claim of disparate treatment of health problems.

**17.** To the extent that plaintiff contends that Harry Wrenn, Anthony Mayer, and Jonathan Sanford were similarly situated males who received lesser disciplinary sanctions (beyond the context of their health problems), the Court concludes that plaintiff has not established that any of these men were as chronically unproductive or delinquent as she.